CLYDE et al. v. RICHMOND & D. R. CO. (ELLIOTT, Intervener).

(Circuit Court, N. D. Georgia. December 10, 1894.)

MASTER AND SERVANT—SAFETY OF APPLIANCES—DUTY OF MASTER.

If a railway company purchases a locomotive from a firm of builders of recognized high standing and reliability, its duty to those employed about such locomotive will be to see, by the use of ordinary tests for determining its strength and efficiency, that it is reasonably safe, and suited to the uses for which it was purchased; and such company is not required to dismantle complicated machinery for purposes of inspection, nor to keep on hand such mechanical contrivances, nor to employ such expert labor, as are required for the highest tests.

This was a suit by William P. Clyde and others against the Richmond & Danville Railroad Company, in which receivers of the railroad had been appointed. Henry Elliott filed an intervening petition, claiming damages for personal injuries. The petition was referred to a special master, to whose report the defendant files exceptions.

This case was, by consent of counsel, referred to W. D. Ellis, Esq., as special master. The report (dated September 18, 1894) of the special master is so complete, and covers the questions involved with such particularity, that it is given in full, as follows:

By virtue of an order of the circuit court of the United States for the Northern district of Georgia, the above-stated intervention was referred to the undersigned, as special master, for hearing and report upon the law and facts connected therewith. Assignment of the case for trial was made, and due notice of the time and place appointed for the hearing was given to the parties plaintiff and defendant. At the appointed time and place, the plaintiff and defendant appeared by counsel, and the case proceeded to a hearing upon the testimony which had been taken on a former trial. An agreement of counsel is hereto attached, which will show the testimony agreed on. It was also agreed by the parties that, in the event a finding should be made for the intervener, the sum allowed should be $10,000, and that the date of the finding should be fixed on the —— day of January, 1894.

### Statement of the Case.

The plaintiff contended that at the time of his injury he was an employé of the Central Railroad & Banking Company as head yard coupler, and that while in the discharge of his duty, in Atlanta, he was stricken by a piece of engine boiler or dome which was blown from a locomotive in the possession and control of defendant, and that such piece was thrown off by the ex-

plosion of said boiler or dome, brought about by the negligence of defendant. The particular acts of negligence were: (1) That more steam was allowed to accumulate than the boiler had capacity to contain. (2) That said dome was so insecurely fastened to the boiler as to render it dangerous, and liable to explode, which defect was known to the defendant. (3) That, on account of the large size and construction of said locomotive, it was not suited to defendant's road, and required great care and diligence on the part of the defendant, which defendant failed to exercise. (4) That said dome was negligently and defectively made and put together, and that such defects were either known or should have been known to the defendant. (5) That the explosion of said boiler was caused by the defective condition of the injector or pump, and that it failed to pump sufficient water into the boiler, which caused the boiler to become hot, and to generate an excessive and dangerous quantity of steam. (6) That the safety or "pop" valve was defective and out of order, and it failed to allow steam to escape when it accumulated to an excessive amount, and that the defects in said injector and pop valve were or should have been known to the defendant. The defendant entered a general denial of the plaintiff's allegation, but contended that, if the dome was defective, it did not render the defendant liable, because it had purchased said locomotive from a reputable manufactory, and had a right to rely upon its proper construction, and was not bound to make such examination as required tearing up the machine or dismantling it to the degree necessary to have determined that such defects did or did not exist. Defendant says that it made all reasonable tests, and it is specially denied that the locomotive was improperly handled, or that either the pop valve or the injector were out of order.

## Findings and Report.

The special master, in determining the questions of fact, labors under the disadvantage of not having had the witnesses before him, and hearing and seeing them testify; but from the testimony some of the points at issue can be solved without difficulty; others with great difficulty. He finds and reports as follows: (1) The plaintiff, at the time of his injury, was in good health, was 26 years of age, and was earning $45 per month. (2) At the time of his injury the plaintiff was head coupler for the engine of the Central Railroad on which he worked, and, at the time of his injury, was engaged in the performance of his duty, and was entirely free from fault. (3) The crew to which the plaintiff belonged were at a part of the railroad where they had a right to be, and were there by consent of defendant, to deliver cars to its road. (4) The defendant owed to the plaintiff ordinary care, and not that extraordinary care which it would owe to a passenger. (5) The dome ring or dome which exploded was carelessly and negligently constructed. The locomotive works which made it were negligent in making it, were negligent in not discovering the defects after it was made, and were negligent in delivering it to defendant to operate upon its line of road. (6) The evidence preponderates in favor of the proposition that competent servants of the locomotive works would or could have known that the method which they must have pursued in casting that particular dome would not have produced a good and safe job. In attempting to account for its defective condition, they assign a reason which other testimony proclaims an improper method. (7) The evidence shows that the defects could have been discovered by "sounding," when the polishing was done, and when the holes were bored for the rivets. (8) The testimony and examination of the exploded dome shows that the locomotive works did not subject the dome to proper tests, or it would then have given away. An examination of the broken parts is convincing of the fact that a test sufficient to determine that the dome ring and boiler were sound and properly constructed in all particulars would then have disclosed the defects that existed at the time it was finished. (9) After the locomotive was completed, and delivered to the defendant, the defects could not have been discovered from the outside, without such dismantling and tearing up as the defendant was not under the law bound to do, if bought from a reputable builder. (10) The proof shows that the parties from whom the locomotive was purchased were a reputable manufacturing establishment of such character and standing as authorized the defendant to rely upon the good

quality of their work, and defendant was authorized to use it, after making those ordinary and usual tests which railway companies can make to determine if locomotives are roadworthy, and in proper running order. (11) Ordinary care and diligence did not require the defendant to take out the dome cap and throttle valve. The testimony shows that explosions occur less frequently from that point than at other points, and a rule which would require this work of inspection, even at a cost of $15, as stated by the witness Collier, would require such inspection and expense on the part of the master as to require the dismantling of complicated machinery, and the keeping of skilled and expensive labor for that service alone. A more reasonable provision would be to so amend the law as to render the factories which negligently construct dangerous machinery liable for the damages it may do, even to a stranger; that is, to one who stands in no privity of contact with them, but who is legally connected with its use. (12) These defects in the dome castings were not known to the defendant, and, not being bound to make such inspection of them as would have discovered them, the defendant is not liable therefor, if it exercised due care and diligence in other respects. (13) In the decision of this case by the supreme court, Judge Brewer, delivering the opinion, used the following language: "We do not mean to say that it is never the duty of the purchaser to make tests or examinations of his own, or that he can always and wholly rely upon the assumption that the manufacturer has fully and sufficiently tested. It may be, and doubtless is, his duty, when placing a machine in actual use, to subject it to ordinary tests for determining its strength and efficiency. Applying these rules, if the rail-road company, after purchasing this engine, made such reasonable examination as was possible, without tearing the machinery to pieces, and subjected it fully to all the ordinary tests which are applied for determining the efficiency and strength of completed engines, and such examination tests had disclosed no defect, it cannot, in an action by one who is a stranger to the company, be adjudged guilty of negligence because there was a latent defect,— one which subsequently caused the destruction of the engine and injury to such party." 13 Sup. Ct. 837. Applying this rule to the question made by the plaintiff in this case, that the defendant was guilty of negligence in not making a test of this locomotive, the special master holds: If a railway company purchases a locomotive from a firm of locomotive builders of recognized high stai.ling and reliability, its duty will be to see that it is reasonably safe, and suited to the uses for which it was purchased, and the trial trip made at Richmond, even in the manner and for the purpose testified to by the witness Gibbs in his examination as a witness in the case against the locomotive works, and the subsequent safe operation of it in active work over a distance of 7,000 miles and for a period of five or six months, was up to the measure of defendant's duty. It would be an unreasonable rule to require railway companies to keep on hand such mechanical contrivances and such experts as could make the highest tests, such as locomotive builders could, or to expose their employés who run and operate locomotives to the danger of applying very high pressure, over the amount necessary to be used, to see to what degree the machine could stand it. The special master does not understand the rule of the supreme court to mean more than that the locomotive should be tested, if bought from manufacturers of high repute, further than to see that it runs well, and is safe for the ordinary duty to be put upon it. (14) The question under consideration, in view of conclusions already reached, turns on the manner in which the locomotive was operated on the night the plaintiff was injured; and the plaintiff having shown that he was injured by the defendant, and that he was free from fault and in no way contributed to the injury, the burden is shifted to the defendant to show that it exercised all reasonable care and diligence. In respect to the defects in the boiler, the defendant has been found free from legal fault. Has it overcome the presumption of negligence as to the management and manipulation of the machine that night? The testimony preponderates that the pop valve, if in proper condition, would have relieved the pressure on the boiler, up to a standard at which the locomotive had been operated for several months, and over 7,000 miles of track it had traveled. It is fair to say that if it had been put to the gauge of 135 pounds, as the witness Cambea says, and had been in

good order, the boiler, defective as it was, would have still stood the pressure. It was making an unusual noise, plaintiff says. "On this particular night the pop cock was making a fluttering noise, as if it was trying to blow off steam, and got stuck." The witness Burnett says: "I am certain the engine was trying to 'pop off,' making a noise as if it was choked up. I never heard an engine make that sort of noise before." The witness Krogg (evidently referring to the noise made by the pop valve) says: "The noise I heard was unusual enough to attract my attention." The witness Postell says: "Before the explosion, the pop made a fizzing noise, as if it was stuck." All these witnesses were accustomed to locomotives, and familiar with the "popping off," and the ordinary noises proceeding therefrom. The witness Lewis swears that one minute before the explosion the steam gauge showed a pressure of 150 pounds, and, if this was true, and the pop valve was set at 135 pounds, it follows that it failed to do its duty. It is said that Lewis is inexperienced, but he undertakes to state a fact which any man could tell by sight, as well as an expert. This man's credit is affected by his interest in the suit involving the same questions. The witness Thrower says: "Just before the explosion the steam gauge showed 130 pounds." On cross-examination he says: "The pressure may have been 135 pounds." This discrepancy in the case shows a want of certainty and confidence on his part as to the exact situation. The witness Cambea says: "I adjusted the pop valve to what I knew was the proper pressure, and to my knowledge it popped off at 135 pounds, as I had screwed five pounds below the ordinary pressure, 140 pounds." This man seems, at that time, to have been just promoted from an apprentice to a journeyman, and hardly up to the standard of a skilled machinist. Considering the fact that this witness was an employé of the defendant, and responsible to the company for the proper setting of this safety valve, and for the destruction of a valuable piece of machinery, and the consequent injury of others, his credit is, to some extent, affected. (15) The special master concludes, and so reports, that the defendant has not overcome the presumption the law casts upon it, that the pop valve was out of order, and failed to do its duty, and that this defect caused the already defective dome to collapse at that particular time, and to inflict this injury upon the plaintiff. The defendant, through Cambea, who testifies that it was his duty to see that the pop valve was in order, was under legal, if not actual, notice of this defect, and it is therefore liable to the plaintiff. (16) The finding on the question of liability being for the plaintiff, the damages are assessed according to the agreement, and the special master reports and finds for the plaintiff the sum of $10,000.

C. T. Ladson and George Westmoreland, for plaintiffs.
Jackson & Leftwich, for defendant.

NEWMAN, District Judge (after stating the facts). No question of law is involved in this case, the simple question raised on argument by counsel for defendant being as to the sufficiency of evidence to support the master's report. Under the recognized rule on this subject, there is clearly sufficient evidence to sustain the report of the special master. The testimony of the witnesses he cites is certainly sufficient to justify his conclusion. The condition of the pop cock, whether it was in good working order, and whether its defective condition caused this explosion at the time, were questions of fact for the determination of the master, who has found them in favor of the plaintiff; and this court will not interfere with his finding, when it is sufficiently supported by evidence. The special master has set forth with so much care the questions before him, and his conclusion and reasons therefor are such, that further discussion of this case would be useless, and the exceptions to the master's report are overruled, and the report confirmed.