ÉVA CEDERBERG v. MINNEAPOLIS, ST. PAUL & SAULT STE. MARIE
RAILWAY COMPANY.[1]

May 17, 1907.

Nos. 15,129—(36).

**Negligence—Res ipsa Loquitur.**

It conclusively appears from the evidence that the crosshead and piston rod of a railway engine are so constructed and fastened that it is not possible, by the exercise of ordinary care, to discover incipient fractures forming in the concealed portions of the rod, without detaching the parts. An injury having been occasioned by the breaking of the piston rod within the crosshead, no presumption of negligence arises with respect to the sufficiency of the rod by reason of the mere occurrence of the incident, and the rule of "res ipsa loquitur" does not apply.

**Inspection of Engines.**

It is a question of fact whether a railroad company exercises ordinary care in the examination and repair of its engines, by inspecting the concealed portions of the piston rods upon those occasions only when the engine is being generally overhauled, or when some external defect in the rod is discovered. It does not conclusively appear from the evidence that the company was guilty of negligence in not from time to time detaching the piston rod from the crosshead for the purpose of inspecting those portions not otherwise subject to observation.

**Burden of Proof.**

Under the issues as framed and tried, the burden was upon plaintiff to prove that the company was guilty of negligence in failing to inspect and repair the engine.

**Charge to Jury.**

The court did not err in charging the jury that they should consider the custom and practice of other railroads in reference to inspection and repair of engines. It was not reversible error to instruct the jury that, before the company could be found negligent in failing to make the inspection, they should find that it had a system of inspection in operation which would have discovered the defect.

**Evidence.**

The evidence supports the verdict of the jury that the company was not negligent.

[1]Reported in 111 N. W. 953.

Action in the district court for Hennepin county by the administratrix of the estate of Frank E. Johnson, deceased, to recover $5,000 for his death. The case was tried before Simpson, J., and a jury, which rendered a verdict in favor of defendant. From an order denying a motion for a new trial, plaintiff appealed. Affirmed.

*Albert E. Clarke,* for appellant.

*Alfred H. Bright,* for respondent.

LEWIS, J.

Frank E. Johnson was employed as an engineer upon a switch engine in the Minneapolis yards of respondent company. The complaint alleges that, while so employed and acting as such engineer, he was killed by the bursting of one of the engine cylinders, the head of which blew off and struck him; that the accident and death of Johnson were wholly due to the defective and unsafe condition of the engine, of which unsafe condition respondent company had notice and knowledge at and prior to the time of the accident, and, having such notice and knowledge, it negligently failed to repair the same. The answer denied that respondent had any knowledge of the unsafe and defective condition of the engine prior to the accident, and denied that it failed, refused, and neglected to repair the same, or that it had any notice that repairs were required. The answer also alleged that by the rules of the company, Johnson, as such engineer, was charged with the inspection of his engine, and that it was his duty to ascertain any defects therein, if any existed, and to report the same in a repair book for repairs, and that, if there was any neglect with respect to the inspection and repair of the engine, it was the fault of the engineer.

It developed at the trial that the accident occurred in the following manner: The engineer, while engaged in his duties, was walking along the footboard on the side of the engine, intending to cross in front of the boiler and return to the cab on the other side. Just as he was in front of the cylinder on the right-hand side, the head of it blew off, struck him, and threw him down on the track in front of the engine, and he was immediately run over and killed.

This was a switch engine of the ordinary type, upon each side of which was what is known as a "crosshead," which was operated between guides. In the forward part of the crosshead is fastened an

iron rod, about two and nine tenths inches in diameter, known as the "piston rod," the other end of which is fastened into the piston head, which operates in the cylinder. In the rear portion of the crosshead is fastened another iron bar, known as the "main rod," which connects the crosshead with the engine wheels. The piston head is driven forward and backward by an automatic arrangement, which injects and exhausts the steam alternately before and behind the piston head. In this instance, when the piston head was being driven forward by steam which had been let into the cylinder behind it, the piston rod broke inside of the crosshead, thereby releasing the piston head, which was driven through the front end of the cylinder by the expanding steam. The crosshead is a steel block, and the piston rod penetrates it several inches, and is held firmly in place by a steel wedge, which is driven down through a slot in the crosshead through a corresponding slot in the end of the piston rod. The break occurred on the inside of the crosshead, where it could not be seen or detected by the engineer, or any other means of inspection, unless the rod was taken out of the crosshead.

It was conceded at the trial that the engineer was not guilty of negligence in not inspecting or detecting the cause of the break. It was also conceded by respondent that the accident was occasioned by the breaking of the rod, as stated, and the only question at issue, and submitted at the trial, was whether or not respondent had used due diligence in inspecting and repairing the engine. It was claimed on the part of appellant that, if respondent had used ordinary care in making inspection of the crosshead and the piston rod, it would have taken the same apart within a reasonable time prior to the accident, and if that had been done, that the incipient fracture would probably have been discovered. On the other hand, respondent contended that it had done all it could be reasonably expected to do, that it made such inspection as was customary, and that it was not practicable to dismantle the engine to the extent of removing the rods from the crosshead for the mere purpose of determining whether the integral parts were perfect.

The court submitted the question to the jury, for them to determine whether, as a matter of fact, under all the circumstances developed by the evidence, respondent had used reasonable care in inspecting the engine. The jury returned a verdict for respondent, whereupon ap-

pellant made a motion for a new trial upon the ground that the verdict was not justified by the evidence, and for errors on the part of the court in charging the jury.

1. The evidence is sufficient to sustain the verdict. The engine in question was built about 1892 or 1893, and in September, 1904, was sent to the shop at Minneapolis, and a new piston rod was put in on the right side, being the rod which broke and caused the accident. The engine again went into the shop December 5, 1904, and remained there till December 30, during which time it was more or less dismantled, and the piston rod in question was examined and considered intact. The accident occurred November 23, 1905, about a year after the examination of the rod. During that year the engine was used at Gladstone, Michigan, a part of the time, and for about three months before the accident was used in the Minneapolis yards. During that year the rod in question was not inspected by removing it from the crosshead.

Several witnesses were called on behalf of appellant and respondent, some of them master mechanics and railway engineers, and they practically agreed that it was not customary among railroads to take the piston rod out of the crosshead for the mere purpose of inspection, unless some defect was apparent, making special examination necessary; that the only inspection made of those parts of the rod which were concealed in the crosshead was when an engine required general overhauling, as was the case with this engine in 1904, and then it was customary to take the rod out of the crosshead, and also to take apart the cylinder, and other detachable parts, for the purpose of closely inspecting and testing the parts before putting them together again.

One witness for appellant, who had been a railway engineer, stated that a yard engine in continuous service should be overhauled every six to nine months, and it appeared from the evidence that this engine was in continuous service during that year. Another witness for appellant testified that the piston rod seldom, if ever, broke in the crosshead, and that the normal life of a piston rod of the quality of material used for such purposes was about ten years. This witness, who was the master mechanic for respondent, also stated that he had examined the rod soon after the accident, and that in his opinion it was not an instantaneous break, but that a fracture had been forming

for some time prior to the accident, and that it was impossible to tell how long it had been forming; that it might have been only a short time, but it might have been a long time.

Several other witnesses, called as experts and representing several different railways, testified that the normal life of a piston rod was eight to ten years, and that such a break was of very infrequent occurrence. Another witness stated that he had been in charge of a roundhouse for twelve years, and in that time probably two rods had broken. Other witnesses stated that it was a difficult matter to take the piston rod out of the crosshead, that the parts were so fastened as to be practically one piece, that it took special machinery to dislodge the key and withdraw the rod, and that such operation was attended with a certain amount of danger to the metal by subjecting it to such severe strain.

From all this evidence it seems very clear to us that whether or not respondent company used reasonable care in discovering the defect in the part of the engine as here described was for the jury to determine. It certainly does not appear conclusively from the evidence that respondent was negligent in not detaching such parts of the machinery for the mere purpose of ascertaining whether or not incipient fractures were forming. If railroads were required to dismantle and take apart such parts of a locomotive in order to detect possible fractures, then the same rule must apply with respect to other parts similarly constructed. The evidence furnishes no guide for the application of the test, and the question resolves itself to simply a question of fact—whether under the circumstances of this case the company did that which was reasonably required of it.

2. The court charged the jury that the mere fact that an accident happens, by which a person is injured, does not give such person, or any one else, an action for damages; that before a right of action arises against another, it must appear that the accident was caused by failure or neglect of the person to be charged; that the burden was upon appellant to prove that the charges made in the complaint were true, viz., that respondent was negligent, and by reason thereof death resulted. Appellant insists that this was error, that the accident was of such a nature as to raise a presumption of negligence under the doctrine of "res ipsa loquitur," and that the burden of proving the contrary was

upon respondent company. That rule applies when the accident presumably would not have happened if due care had been exercised, or where the very nature of the occurrence carries, or supplies, the requisite proof (Labatt, Master & Servant, § 834); also where a building falls without apparent cause (Ryder v. Kinsey, 62 Minn. 85, 64 N. W. 94, 34 L. R. A. 557, 54 Am. St. 623), or an awning, as in Waller v. Ross, 100 Minn. 7, 110 N. W. 252. But in the case before us negligence is predicated upon failure to inspect and repair. No presumption of negligence arose from the mere occurrence, because it does not conclusively appear that ordinary care would have discovered the fracture, and the rule of "res ipsa loquitur" has no application.

3. The court instructed the jury that employers of labor were bound to furnish employees with reasonably safe appliances; that an employer does not insure their safety, but is charged with the duty of exercising reasonable care and diligence in seeing that the same are reasonably safe; and that such duty is a continuing one. Also:

> There has been testimony introduced in this case of the custom of inspection on other roads. That is a matter which you may properly consider in determining this question of whether or not the method employed by this defendant was a reasonably proper method, because the fact that a custom exists among a large number of people in similar employments is one matter to take into consideration in determining what would be reasonable care.

And again:

> You will understand that in determining the duty of the defendant you should not consider merely what it might have done with reference to this particular rod to avoid this particular accident. The duty of the defendant in reference to these appliances is a general duty. The duty of caring for, by inspection, involves the adoption and carrying out of a general system of inspection of all its engines, and all its appliances, and all its rods under similar conditions. So that, before you would find the defendant was negligent in this regard, in failing to make an inspection and discovering the defect in this particular rod, you should find that the defendant, in the exercise of rea-

sonable diligence, should have had a plan and system in operation as to its engines of similar character and doing similar work that would have discovered this defect in time to have remedied it prior to the accident.

We discover no error in the charge as a whole, and, when the portions above referred to are examined with reference to the evidence and the issues, it is clear that the jury were not misled, and that the question at issue was fairly and fully submitted for their consideration. Appellant is not warranted in the assertion that it conclusively appears from the record that the company made no inspection whatever. As already stated, the purport of the evidence was that no special examination or inspection was made of the parts involved, unless some special reason arose which called for the detachment of the parts or a general overhauling of an engine. This does not mean there was no inspection. It would be more accurate to say there was no systematic inspection, by detaching the parts for the mere purpose of determining whether or not incipient fractures were forming.

As bearing upon the question whether or not respondent was pursuing a reasonably practical and safe course in the examination and repair of its engines, it was perfectly proper to show what other railway companies did under similar circumstances with engines of like make.

The last portion of the charge above quoted is not misleading. The court stated that, before respondent company could be found negligent in failing to make the inspection, they should find that it had a system in operation which would have discovered the defect in time to remedy and avoid the accident. It was undisputed that the fracture which resulted in the break was concealed, and could not have been discovered by any of the ordinary processes of inspection, either by the engineer or mechanics in the repair shop. It also appears that the crosshead was so constructed that it was not essentially different from other parts of the engine, which were solidly joined and were not intended to be taken apart during ordinary repairs. Consequently the system of inspection which the court referred to was one which would apply, not only to the crosshead, but to other parts of the machinery and to

all other engines. In other words, if respondent was guilty of negligence in not taking apart the crosshead and rod in order to inspect the end of this particular piston rod, then it was equally negligent in failing to take apart other portions of the engine which were similarly constructed. If that rule should apply to this engine, then it should apply to all engines. All through the trial, more or less was said about the system, or custom, of inspection, and it was only a reasonable and fair conclusion, from the evidence, that respondent would not be negligent in the instance charged, unless it was negligent in failing to adopt a general plan of inspection for all such parts including all of its engines.

Affirmed.