## LOWDEN et al. v. HANSON.
#### No. 12440.

Circuit Court of Appeals, Eighth Circuit.
Feb. 18, 1943.

Rehearing Denied March 20, 1943.

Philip Stringer, of St. Paul, Minn. (E. S. Stringer, John D. Stringer, both of St. Paul, Minn. and F. W. Root, C. O. Newcomb, and A. C. Erdall, all of Minneapolis, Minn., on the brief), for appellants.

Ernest A. Michel, of Minneapolis, Minn. (Tom Davis and Carl L. Yaeger, both of Minneapolis, Minn., on the brief), for appellee.

Before GARDNER, JOHNSEN, and RIDDICK, Circuit Judges.

GARDNER, Circuit Judge.

This was an action brought by appellee as plaintiff against appellants as defendants to recover damages on account of personal injuries received by appellee while in the employ of the appellant trustees of the Chicago, Rock Island and Pacific Railway Company as a switchman at St. Paul, Minnesota.

350

On stipulation of the parties the action was tried to the court without a jury resulting in a judgment in favor of appellee. The parties will be referred to as they were designated in the trial court.

Defendants Frank O. Lowden, James E. Gorman and Joseph B. Fleming are trustees of the Chicago, Rock Island and Pacific Railway Company, while the defendants Henry A. Scandrett, Walter J. Cummings and George I. Haight are trustees of the Chicago, Milwaukee, St. Paul and Pacific Railroad Company.

Plaintiff was injured while he was attempting to turn the center shaft or spindle of a spring switch stand. This switch stand was the property of the Milwaukee trustees but was being used at the time plaintiff received his injuries under a trackage agreement between the two railroads by the switching crew of the Rock Island trustees. So far as the Rock Island trustees are concerned the action is governed by the provisions of the Federal Employers Liability Act. But as to the Milwaukee trustees it is governed by the common law of Minnesota. However, as to both it is bottomed on allegations of negligence and there is no claim that the rule applicable under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., differs from the applicable rule under the common law of Minnesota. Plaintiff alleged negligence on behalf of the trustees of the Rock Island in their failure to use reasonable care to furnish plaintiff a safe place in which to work and in failing to make, or cause to be made, proper, careful and efficient inspection of the spring switch stand, and that any inspection made by the trustees of the Rock Island was made in a careless, negligent and improper manner. He also alleged negligence on behalf of the trustees of the Milwaukee Company in failing to use reasonable care to keep and maintain the switch stand in a reasonably safe condition, and in allowing the switching apparatus and switch stand to become broken and defective and in such condition as to constitute a hazard to persons obliged to throw or operate it. There was no issue as to the relation of the defendants to the switch stand nor as to the relative rights of the defendants to its use. It was a spring switch designed to be used at places where two tracks converge into one. Its function was to enable a train to approach, pass over and proceed beyond the switch without the necessity of stopping, lining the switch, passing over, stopping and relining again, as in the case of the ordinary rigid switch. The switch functions automatically for trains passing in one direction, but if it is necessary to pass back over the switch in the opposite direction then the switch must be operated by hand. At the time of the accident plaintiff was head brakeman on a railway train. As that train approached this switch from the west it stopped and all the cars were cut off from the engine. Plaintiff then mounted the engine which proceeded eastward through the switch, no manual lining up being necessary because of the automatic feature. But having passed through the switch engine after some movements reversed and began a westward movement which required the manual operation of the switch. This plaintiff undertook to do. He raised the handle, released the automatic feature of the switch, and threw the manual operation. He then rotated the handle in a clockwise direction, then lowered the handle to its new position which had the effect of locking it. Just as he was in the act of lowering the handle the spindle or shaft broke, plaintiff fell to the ground and the upper part of the switch stand fell on top of him inflicting serious injuries. An examination of the broken spindle showed that two-thirds or three-fourths of the break in the shaft or spindle was an old break.

The court entered detailed findings determining the issues of negligence against the defendants and from the judgment entered thereon defendants prosecute this appeal, seeking reversal on substantially the following grounds:

(1) There was no negligence on the part of defendants.

(2) There was no liability for inherent defects in the switch stand appliance, it having been made and sold by a reputable manufacturer.

(3) It was not the custom to inspect or test the inner working parts of the switch system or similar appliances either by dismantling or tapping.

(4) Defendants were not required to anticipate and guard against a mishap, the like of which was never known to have occurred before.

The trial court having found the issues of fact in favor of plaintiff, all conflicts in the evidence must be presumed to

have been resolved in plaintiff's favor, and its findings are presumed to be correct and should not be set aside unless clearly erroneous. Rule 52(a), Rules of Federal Procedure, 28 U.S.C.A. following section 723c. There is not much dispute in the evidence and the question presented is whether or not under the undisputed evidence the court properly inferred the existence of negligence. We shall not attempt to differentiate between the duty owed the plaintiff by the respective defendants. It seems to be assumed as sufficient to sustain the judgment if the trustees of the Rock Island, plaintiff's employer, were guilty of actionable negligence resulting in plaintiff's injuries. As employers they were under the duty of exercising ordinary care in furnishing the plaintiff with reasonably safe appliances with which to work and a reasonably safe place in which to perform his services. But this was not the limit of their duty toward the plaintiff. They were under the continuing duty of exercising ordinary care to see that the instrumentalities and appliances furnished for the use of plaintiff, as well as the premises where he was required to work, were maintained in a reasonably safe condition. Phillips Petroleum Co. v. Manning, 8 Cir., 81 F.2d 849. It was, therefore, their duty to have the appliances so furnished inspected from time to time. Here it appears from the undisputed evidence that this spring switch stand was one of standard make, in general use and manufactured by a reputable manufacturer. When received and installed it was in the nature of a unit and not dismantled; there was no evidence that it was not properly installed so that in the first instance it cannot be said that the defendants failed to exercise ordinary care in supplying, furnishing and installing this equipment. Richmond & D. R. Co. v. Elliott, 149 U.S. 266, 13 S.Ct. 837, 37 L.Ed. 728; Clarkson Coal & Dock Co. v. Northern Lakes S. S. Co., 8 Cir., 251 F. 181; Jenkins v. St. Paul City R. Co., 105 Minn. 504, 117 N.W. 928, 20 L.R.A., N.S., 401. Of course, the rule could not be invoked if the appliance or equipment were patently and openly defective. But there was nothing about this finished product indicating to the naked eye that it was at the time it was installed deficient in any particular, and no one is required to guard against that which a reasonably prudent person under the circumstances could not anticipate as likely to happen

(Ft. Smith Gas Co. v. Cloud, 8 Cir., 75 F. 2d 413, 97 A.L.R. 833); the equipment having been purchased from a reputable manufacturer, we are clear that the defendants could not be charged with negligence because of any structural or inherent defect which was not patent at the time of its installation. Defendants were warranted in assuming in the absence of any notice to the contrary, that the equipment was without structural defects, and it was not incumbent upon them to dismantle the appliance and separate it into its various parts for the purpose of discovering possible defects. It was manufactured, assembled, inspected and tested by experts before it was ever placed upon the market. This was implied from the fact that the manufacturer was a reputable one. While it was the duty of defendants to inspect this appliance, it is our view that in the absence of any evidence that it was not properly functioning, defendants were not required to dismantle the appliance and submit it to a microscopic inspection or the other scientific tests suggested by one of the witnesses for the purpose of discovering possible structural defects. The functioning of the switch did not indicate any defect or break, nor did it give notice or warning of any deficiency. Under the undisputed evidence we are of the view that there was no negligence in failing to discover an alleged structural defect nor in failing to dismantle and subject the instrumentality to a microscopic inspection, there being no evidence of a custom of submitting such appliances to such a test. Copeland v. Chicago, B. & Q. R. Co., 8 Cir., 293 F. 12; Canadian Northern R. Co. v. Senske, 8 Cir., 201 F. 637; Lake v. Shenango Furnace Co., 8 Cir., 160 F. 887; Waddell v. A. Guthrie & Co., 10 Cir., 45 F.2d 977; Shankweiler v. Baltimore & O. R. Co., 6 Cir., 148 F. 195; Weireter v. Great Northern R. Co., 146 Minn. 350, 178 N.W. 887; Cederberg v. Minneapolis, St. P. & S. S. N. R. Co., 101 Minn. 100, 111 N.W. 953; McGivern, etc., v. Northern Pacific R. Co., 8 Cir., 132 F.2d 213, 218. In McGivern v. Northern Pacific R. Co., supra, we said: "These instrumentalities were in general use and met with general approval for the performance of this work. Two other carriers doing switching in Minnesota were shown to follow exactly the same practice. While custom or usage may not be controlling as fixing the standard of care it may be accepted where the cus-

tom or practice is not in itself negligent or in disregard of the safety of the employee." In Canadian Northern R. Co. v. Senske, supra, the late Judge Walter H. Sanborn, speaking for this court, among other things said [201 F. 643]: "The degree of care commonly exercised by other persons engaged in the same kind of business under similar circumstances presents such a standard. * * * the best test of actionable negligence and the true standard for the measurement of ordinary care is the degree of care which persons of ordinary intelligence and prudence, engaged in the same kind of business, commonly exercise under like circumstances. If the care exercised in the case rises to or above that standard, there is no actionable negligence."

The evidence was to the effect that it was not the custom in inspecting appliances of this sort to dismantle them or subject them to microscopic examination. In the absence of any apparent defect or of any failure to function there was nothing to suggest the necessity or propriety of dismantling this apparatus for the purpose of microscopic inspection. Certain instructions were issued by the manufacturer with reference to inspections. These contained no suggestion that a dismantling of the apparatus should be necessary in making inspection. The only reference to a general inspection found in the instructions reads as follows: "The switch stand should be inspected frequently and it is recommended that the signal department and the track department make a joint inspection occasionally." The evidence shows that this instruction was complied with by the defendants.

Quite aside from this, however, it appears from the evidence, which the court credited, that the defect consisting of a break in the shaft could have been detected by the very simple device known as tapping. An ex-section foreman testified that the defect in the spindle could have been discovered by the tapping test, which he said was an ordinary practice. He described this method as being a dependable method of determining the existence of a crack in the spindle or shaft such as here involved. An expert witness described this method as follows: "The common method is to simply take a hammer, or some metal part, and rap the piece in question, and listen for a metallic ring. If the piece is cracked, it will

be a dull sound. If the piece is solid, it will have a live sound as we call it." This witness testified that the tapping test would have disclosed the old break in this spindle. At least two witnesses testified to the effectiveness of this simple test and we think, especially in view of the fact that this appliance was subjected to great and constant stress and vibration, the evidence warrants the court's finding that failure to apply this simple test in the circumstances here disclosed indicated a want of ordinary care. This finding, supported as it is by substantial evidence, is sufficient to sustain the judgment, as want of care in this regard was the proximate cause of the accident resulting in plaintiff's injuries. We have considered the other questions urged by appellants but in view of our conclusion on this issue we deem it unnecessary to give them separate consideration.

The judgment appealed from is, therefore, affirmed.

### On Petition for Rehearing.

In their petition for rehearing, appellants challenge that part of our opinion in which we express the view that the evidence warranted the court's finding that failure to apply the tapping test, in the circumstances disclosed, indicated a want of ordinary care. It is said that the court made no such finding. The court found that, "The spindle could have been inspected for breaks or flaws from time to time by tapping, or by the 'whiting' test, or by the use of a magnifying glass * * *."

Appellants now say that each of these tests required that the spindle be removed from the appliance. This was manifestly the contention of defendants in the lower court and their evidence would probably have warranted such a finding. The witness Dowdell, testifying as an expert on behalf of plaintiff, with reference to this device, among other things, said:

"The common method is to simply take a hammer, or some metal part, and rap the piece in question, and listen for a metallic ring. If the piece is cracked, it will be a dull sound. If the piece is solid, it will have a live sound as we call it."

The witness was then interrogated:

"Q. Now, looking at this particular switch stand in question, this spindle (indicating),—I call your attention to the square part, near the standard (indicating),—is

that part of the spindle on which there is no housing around it? A. Yes, sir.

"Q. Now, could that, in your opinion, have been tapped in order to determine whether there is a break in any part of the spindle? A. Yes, sir.

"Q. And in your opinion as a metallurgist, if it had been so tapped, would that show that there was a break? A. If the proper person tapped it.

"Q. Well, anybody? A. Anybody that would know enough about it, yes.

"Q. Well, what do you mean by the proper person,—the man that inspected it? A. Yes, sir, the inspector.

"Q. A section man? A. A section man, I believe, could be instructed to take care of it, even.

"Q. Now, I will ask you, in examining this particular spindle, whether there is another place where it could have been tapped at the bottom, where the circular spindle is? A. Yes, sir.

"Q. And that bottom part is exposed, so that a tapping of the spindle at the bottom,—would that indicate to an ordinary person, familiar with that work, that there was a break in the spindle? A. Yes, either tap it at the top or the bottom.

"Q. Is that the customary and usual way of determining whether there is a break in the metal? A. It is very customary; it has been used on the railroads for years.

"Q. You are familiar, of course, with tapping by what are called carknockers, when trains come into the station? A. Yes, sir.

"Q. They tap these wheels, and listen for a noise? A. Yes, sir.

"Q. And they tap these wheels in order to determine whether there is a crack or any defect in the metal? A. That is right.

"Q. They tap them with a hammer, or a piece of metal? A. Yes, sir.

"Q. Now, in looking at this stand, assuming that you found there a piece of metal, in the nature of a key, so-called, in your opinion, could that be used to tap that spindle? A. Yes; there was a sort of a key or spike used as a clutch to hold this switch down.

"Q. And that would not be a difficult thing to do then, would it? A. No, sir.

"Q. It would take very little tapping? A. Yes, sir.

"Q. And in your opinion as a metallurgist, assuming that this break was from two-thirds to three-quarters of the way across the spindle at the time of the accident, and the rest of it was a new break, I will ask you if you have an opinion as to whether or not, if it could be used on this spindle, either at the top or at the circular part at the bottom,—whether or not it would disclose a break, and an old break in this spindle? A. Yes, sir.

"Q. You know that it would? A. Yes, sir."

On cross-examination, the witness was interrogated specifically as to whether contact of the spindle with outside objects would not render the tapping test unreliable, but he maintained that it would not. On re-direct examination, he stated that this particular spindle was quite loose in the housing. He was then interrogated:

"Q. Now, the effect of tapping this, where it is loose, would indicate, would it or would it not, in a normal tapping test, a break? A. Yes, sir, it would.

"Q. And the greater the break the more easily it would be recognized by the sound? A. Yes, sir.

"Q. And this break being two-thirds of the way across, if a tapping test had been made at either the top or the bottom of the spindle, in your opinion would that have been clearly discernible or recognized by the average person? A. Yes, sir.

"Q. And is that a common and dependable test, in order to determine a break or crack in a piece of metal? A. It is. That switch spindle is quite loose in its housing."

Clearly, the testimony of plaintiff with reference to the tapping test referred to the switch stand as it stood in use without being removed or dismantled, and when the court found that, "The spindle could have been inspected for breaks or flaws from time to time by tapping," it manifestly had in mind the tapping test as described by the testimony of plaintiff and it resolved the contention with reference to this test in favor of plaintiff. This view is further fortified by the fact that defendants requested an additional finding to the effect that, "The testing of spindles in such switch stands while in assembled position by the tapping of the exposed portions thereof would not furnish any dependable or reliable information as to the soundness of the spindle." This was defendants' contention

354

below and they introduced evidence in support of that contention, but this merely raised a conflict in the evidence which the court resolved in favor of plaintiff, and it not only made the finding that the spindle could have been inspected for flaws by the tapping test, but declined to find that such a test would not furnish dependable or reliable information as to the soundness of the spindle if the spindle were in the switch stand in an assembled position when the test was made.

The petition for rehearing is therefore denied.