### SHREVEPORT RYS. CO. v. CITY OF SHREVEPORT et al.

District Court, W. D. Louisiana, Shreveport Division.

January 6, 1930.

No. 350.

Wm. H. Armbrecht, of Mobile, Ala., and Wise, Randolph, Rendall & Freyer, of Shreveport, La., for complainants.

B. F. Roberts and Frank J. Looney, both of Shreveport, La., for respondents.

DAWKINS, District Judge. This suit was brought to enjoin the city of Shreveport, its officers and agents, from enforcing certain ordinances prohibiting the operation of street cars on all but two of plaintiff's lines without using both a conductor and motorman, or what is commonly termed two-men cars. The first ordinance was enacted in May, 1907, requiring a conductor and motorman on all cars under penalty of a fine of from $25 to $100; the second was passed in December, 1917, compelling the company to provide an entrance at the rear end and exits at both ends of each car, with similar penalties against the officers and employees of the railroad company. In 1922 these ordinances were amended so as to permit the operation of one-man cars on what are called Fairfield and Union Depot lines.

In substance, plaintiff charged that these requirements were arbitrary, unreasonable, and unnecessary for the safety and convenience of the public, but compelled it to make useless expenditures for an extra man on each car, thereby depriving it of its property without due process of law, and taking it for public use without just compensation, contrary to the Fourteenth and Fifth Amendments to the Federal Constitution. The financial status of the company was set forth in much detail, and discloses a condition bordering on bankruptcy; but plaintiff alleged that by using one-man cars, it could earn enough to pay interest on its bonded indebtedness and for a dividend on its stock; that, even if said ordinances of 1907 and 1917 were

a proper exercise of police power by the city at the time of their adoption, they have become obsolete and oppressive because of the change of conditions in the city of Shreveport, and the "improvements made in the arts and sciences, particularly the arts and sciences of building and operating street cars. * * * " Other allegations were made as to the increased cost of operation, including labor and materials since 1917, without a corresponding increase in gross revenues and the loss of patronage due to the use by the public of automobiles.

The defendants moved to dismiss the petition, largely upon the ground that the same question had been decided adversely to plaintiff by the courts of the state and the United States Supreme Court, in a case arising through criminal prosecution of one of its agents in 1917. Sullivan v. City of Shreveport, 251 U. S. 169, 40 S. Ct. 102, 64 L. Ed. 205. This motion was overruled because of the alleged change in conditions since that time, and the material allegations of the bill were put at issue by what amounts to a general denial.

The matter was referred to a master upon the issues of fact only, who spent several weeks taking testimony and receiving depositions of witnesses taken in other states. In his report he finds for the plaintiff substantially on all important questions as follows:

That the city ordinances existed and would be enforced as alleged, unless the court intervenes. That the present value of plaintiff's property used and useful in the public service, less depreciation, is $2,382,396.54. That its indebtedness consists of $605,000 of outstanding mortgage bonds, and $220,000 due to banks upon notes bearing the individual indorsement of its stockholders, or a total of $825,000. That the gross receipts during 1928 were $669,418.81, while operating expenses and a reasonable allowance for depreciation amounted to $612,181.25, thus giving a net revenue for the payment of interest on its indebtedness and for dividends of $57,-237.56. That the interest paid for that year was $46,701.59, leaving only $10,535.97 for dividends. That the net return upon the present value of plaintiff's property in the public service was approximately .0243 per cent. That the property was economically managed, the annual salaries paid to its officers and other executives being as follows: Chairman of the Board of Directors, $3,000; president, $7,500; auditor, $4,500; superintendent of power and equipment, $3,600; supervisor of substations, $2,700; superin-

tendent of transportation, $2,400; claim agent, $2,400; roadmaster, $2,400.

That the operating expenses of plaintiff company, exclusive of depreciation and taxes, was .2323 per car mile as compared to an average of .271 for twenty-four representative companies in the same class. That no dividends have been paid since 1923, when $30,000 was distributed, or three per cent. upon the stock then outstanding of $1,000,-000. That only three dividends have been paid within the past 14 years, amounting in the aggregate to 9 per cent. of the capital stock. That the plaintiff has from time to time made application to the Louisiana Public Service Commission for authority to increase its fares, but each increase has resulted in a loss of business with no appreciable benefit. That, if the company is permitted to operate its cars with one man, the same will result ultimately in a saving at the present rate of wages, of $93,921.92 per year; that the company at present has no credit; and, but for the personal indorsement of its stockholders, could not raise funds to continue operation; that the change from two to one employee upon the cars will be gradual, owing to the necessity for replacing the old with new equipment, and it will not be necessary to discharge any of its employees, for the annual turnover of labor will be approximately sufficient to take care of the numbers which are dispensed with.

On the question of the relative safety of operation between one-man and two-men cars, I quote the master's finding as follows:

"As to the relative safety between one man operation and two men operation, the Master finds the following facts:

"That the evidence of the numerous witnesses testifying on this point, many of whom are ex-motormen and conductors, shows conclusively that it has been the experience of those companies which have operated both systems that the total number of accidents were reduced by one man operation of cars equipped with modern safety devices. (Koonce, Ev. 227; W. L. Smith, Plffs. Ex. No. 12, pg. 12; Shaner, Plffs. Ex. No. 15, pf. 14; Hanson, Plff's. Ex. No. 7, (4), p. 7; Owen, Plff's. Ex. No. 11, pp. 4–6; Fennell, Plff's. Ex. No. 8, p. 62; Ackerman, Plff's. Ex. No. 13, p. 13.) The experience of companies operating in Dayton, Ohio (William Owen, Ex. No. 11, pp. 3–4); Brooklyn, Morgan, Plff's. Ex. No. 17, (1), pp. 10–14; Atlanta, Butler, Plff's. Ex. No. 20, pp. 6–8–16, and Knoxville, Kelly, Plff's. Ex. No. 19, pp. 8–10), are particularly referred to as disclosing marked decrease in accidents.

"The Master finds that the type of accidents known as 'step accidents,' occurring while passengers are getting on and off the cars, have been greatly reduced and that this is true even where, on account of the increased automobile traffic, the number of accidents from all causes may not have been reduced, or may even have been increased, (W. L. Smith, Plff's. No. 12, p. 8; Hanson, Plff's. No. 7, (4), p. 5; Ackerman, Plff's. Ex. No. 13, p. 11; Owen, Plff's. No. 11, pp. 3–4; Holtzclaw, Ev. 123–138; Carroll, Ev. 177), and that in many cities 'step accidents' have been practically eliminated by one man operation of safety cars. (Shaner, Plff's. No. 15, p. 17; West, Plff's. No. 7, (7), p. 20; Holtzclaw, Ev. 122–123–138; Carroll, Ev. 177.)

"The Master finds that in the opinion of nearly all the witnesses who testified on the point, one man operation with modern safety devices is safer than two man operation of the old type of car, and several of the witnesses considered that one man operation is safer in all cases than two man operation. (Alexander, Ev. 248; Kroner, Ev. 303; Fitzgerald, Ev. 335–6–8; Beck, Ev. 274–78; Hartford, Plff's. No. 15, p. 5; Shaner, Ibid, pp. 13–15; Paul, Plff's. No. 18, p. 29; West, Plff's. No. 7, (7), p. 19; Markham, Plff's. No. 9, p. 24; Hanson, Plff's. No. 7, (4), p. 5; Morgan, Plff's. No. 17, (1), p. 13; Lindley, Plff's. No. 8, p. 92; Butler, Plff's. No. 20, p. 6.)

"That, according to figures compiled by the American Electric Railways Association, the number of accidents of all kinds per 10,-000,000 car miles, reported by thirty-one companies operating all one man cars, was 46.07% less than those reported by fifty-seven companies operating all two man cars, or both two man and one man cars; that the ratio between the same companies on the same basis, as to collisions with motor vehicles, was 66.6 in favor of the one man cars, and that all other classes of accidents showed a decrease. (Plff's. Ex. No. 17, Murphy, Ex. No. 2.)

"The Master finds that the reasons given by the various witnesses for the opinions thus expressed are many:—

"That placing responsibility on one man makes for greater safety even as between the operation of the same type of car, or one having all modern safety devices. (Holtzclaw, Ev. 133; Shaner, Plff's. No. 15, p. 16; Harvey, Plff's. No. 15, p. 25; Hanson, Plff's. No. 7, (4), p. 6; Fennell, Plff's. No. 8, pp. 64–68; Lindley, Plff's. No. 8, p. 93; Ackerman, No. 13, p. 11; Butler, Plff's. No. 20, p. 7;

D. A. Smith, Plff's. No. 10, p. 6; Fitzgerald, Ev. 338; Hartford, Plff's. No. 15, p. 7; Paul, Plff's. No. 18, pp. 20–30; W. L. Smith, Plff's. No. 12, p. 6; Morgan, No. 17, (1), p. 10.)

"The Master finds that many of the witnesses thought that the elimination of the 'human element' and the substitution therefor of automatic devices, all controlled by one man, was responsible for the increased safety of operation. (Kroner, Ev. 303; Buffe, Plff's. No. 8, p. 15.)

"That another reason for the increased safety of one man control was the elimination of the confusion with regard to signals between conductor and motorman, (Carroll, Ev. 183; D. A. Smith, Plff's. No. 10, p. 7; Ackerman, Plff's. No. 13, p. 11; Morgan, Plff's. No. 17, (1), p. 11) and one witness testified that while he was operating a car as motorman a passenger gave him the wrong signal to stop, which resulted in an accident, causing the passenger to be thrown to the pavement. (Lindley, Plff's. No. 8, p. 95.) That other witnesses assigned as one of the reasons for increased safety, the ability of the operator to see the passengers as they board the car. (Koonce, Ev. 227; Steele, Plff's. No. 7, (7), p. 5; Ackerman, Plff's. No. 13, p. 16; Bosworth, Plff's. No. 14, p. 2; Owen, Plff's. No. 7, (6), p. 5.) That some of the witnesses testified that under the two man system the conductor and motorman are disposed to talk to each other while the cars are in motion. (Koonce, Ev. 226; Beck, Ev. 284; Kroner, Ev. 321; Paul, Plff's. No. 18, p. 30; Bosworth, Plff's. No. 14, p. 2; W. L. Smith, Plff's. No. 12, pp. 6–18; Morgan, Plff's. No. 17, (1), p. 13.) The record does not show, however, that any accidents have actually resulted from this cause. Although it seems from the testimony that where all of the responsibility is placed on one man, he becomes more alert than in cases where the responsibility is divided. (Holtzclaw, Ev. 133; Koonce, Ev. 228; Alexander, Ev. 246.)

"That from the experience of many companies, one man cars are as safe if not safer than two man cars while operated under the following conditions:—

"(a) At railroad crossings. (Harvey, Plff's. No. 15, p. 26; Hanson, Plff's. No. 7, (4), p. 11; Carroll, Ev. 187; Alexander, Ev. 248–9.)

"(b) On heavy grades. In this connection, the testimony shows that the steepest grade in Shreveport is less than 11% (R. E. Jacobs, Ev. 396–7–8), while one man cars are operated successfully in Salt Lake City with

grades as high as 12% (West, Plff's. No. 7, (7), p. 8); in Kansas City with a grade as high as 13% (Buffe, Plff's. No. 8, p. 4). Mr. Fennell gave the maximum Kansas City grade at 12% (Plff's. No. 8, p. 51); and it is shown that no additional danger results from operating one man cars on grades as steep as, or steeper than, exist in Shreveport. (Ackerman, Plff's. No. 13, p. 12.)

"(c) On narrow streets. It is shown that while there are no narrow streets in Shreveport, even in cities that contain narrow streets no increased danger results from operating one man cars there over. (Fennell, Plff's. No. 8, p. 51; Hartford, Plff's. No. 15, p. 8; Butler, Plff's. No. 20, p. 15; Carroll, Ev. 187; Alexander, Ev. 249.)

"(d) Streets crowded with traffic. While there are no congested districts in Shreveport, the streets being wide and the population well distributed, it is shown that in such cities as Kansas City, Pittsburg, Dayton, Brooklyn, Atlanta, and Knoxville, one man cars are successfully operated with fewer accidents and better schedules than was the case under the two man operation. (Fennell, Hartford, Kelly, Carroll and Alexander.)

"(e) Heavily loaded cars. While relatively speaking there are no heavily loaded cars operating in Shreveport, with the growth of the city, it is possible that at some future time traffic may so increase as to heavily load the cars here. In this connection, it is shown that in cities where cars are heavily loaded, one man cars are operated as satisfactorily and safely as were two man cars. (Harvey, Plff's. No. 15, p. 25; Fitzgerald, Ev. 353–4.)

"The Master finds that since the years 1907, in which one of the ordinances under attack was adopted, and 1917, in which the case of Sullivan v. City of Shreveport was decided by the U. S. Supreme Court (251 U. S. 169, 40 S. Ct. 102, 64 L. Ed. 205), marked changes have taken place with regard to the equipment of street cars, and that many of these improvements have, either by accident or design, produced a car which can be compared to an automobile or bus in its adaptibility to one man operation.

"That in the evolution of the present type of car, a car which is known as the 'Birney car,' being the pioneer of this type, one of the first improvements rendered necessary by the rapid increase of automobiles, jitney and bus competition, was a pronounced reduction in the weight of the car. That the light car thus produced was and is capable of much more rapid acceleration and deceleration. (Holtzclaw, Ev. 161.) That according to one

witness, the idea of making the car lighter was suggested by the mechanical arrangement of the modern automobile, and the fact that jitney cars and buses were operated by one man. (Beck, 261.)

"That in addition to lightness in weight, the car designed for one man operation was, in the course of its development, equipped with what is called a 'dead man control.' (Beck, 263; Buffe, Plff's. No. 8, pp. 14–15; Gass, Plff's. No. 9, pp. 3–4–8.) That as explained by a number of the witnesses, this device operates to automatically stop the car when the hand is released from the control lever and the foot taken from an apparatus near the floor on which the foot rests while the car is in motion. The device immediately applies the brake, cuts off the power, and, if so equipped, applies sand to the rail, at the same time 'balancing' the doors so that they may be operated without difficulty by any passenger by hand. (Buffe, Plff's. No. 8, p. 45; Fennell, Plff's. No. 8, pp. 56–57.) That a further improvement was an arrangement by which a car operated by one man could be controlled from the rear, the earlier equipment not permitting this. With this arrangement, the operator can go to the back of the car and operate it while going in the reverse direction, without the necessity of backing it. Prior to 1917, the car could be backed or operated backward only from the front end. (Beck, Ev. 282–290.)

"The evidence also shows that since 1917, improvements have been made in the brake equipment, and that there are now at least seven ways to stop a car, some of them being automatic, others controlled by the hand or foot. Some of the cars are equipped with magnetic brakes operated automatically. (Boudreaux, Ev. 426; Kroner, Ev. 295.)

"That in 1917, equipped with the braking system then in vogue, it required three seconds to complete a full air brake application, or to develop a fifty pound brake cylinder pressure; that the same development of brake cylinder pressure is accomplished in one-third the time. (Beck, Ev. 258.) That, applying this formula to a car going twenty miles per hour, under the old practice the distance required within which to stop was 115 to 220 feet as against 65 to 70 feet with the present equipment. (Beck, Ev. 258.)

"That another improvement is the complete foot control, leaving the hands free. (Kroner, Ev. 295.)

"That since 1917, the 'brake interlock' has been developed. (Paul, Plff's. No. 18, p. 19.) That this device makes an auxiliary or additional separate application of the brakes so that even if the motorman should attempt to release the brakes while the doors are opened, he could not do so and, in the event he should apply power to the motors, the circuit breaker is opened and current cannot be transmitted to motors with the brakes applied. That the brake interlock has also been improved by the addition of a 'brake interlock tryout.' (Paul, Plff's. No. 18, p. 21.) That this device prevents the doors from opening or operating if the brake interlock is not functioning properly. In the event that the current should go off, a wire should come loose, or a pipe break, the device would function and the door would not open.

"That a 'tripping' device has also been applied to the door which causes it to reverse from a closing to an opening movement should it strike a passenger or obstruction of any kind. (Paul, Plff's. No. 18, p. 21.) That in this connection, the door engines have been further improved by the application of a device known as the 'yielding valve' or the constant 'speed feature,' so that should they be held up in their closing movement by a passenger or obstruction, when released they will not have built up pressure and power sufficient to close the door in a quick severe and dangerous manner. (Paul, Plff's. No. 18, p. 22.)

"That another improvement since 1917 is in the 'safety cap' between the edge of the door and the post. This usually consists of rubber strips so arranged that after the door closes, an arm or finger could be withdrawn from the aperture without injury if caught therein. (Paul, Plff's. No. 18, p. 22.)

"That another device is the 'treadle door,' which was invented about five years ago. (Markham, Plff's. No. 9, p. 18; Paul, Plff's. No. 18, p. 23.) That this device is controlled by a plate in the floor, which, when actuated by the weight of a passenger's body, automatically opens the door. That the door will not open while the car is in motion and while the door is open the car will not start. That after the passenger has left the car, a timed device automatically closes the door. That this is usually set at two or three seconds from the removal of the passenger's weight on the step.

"That the treadle is not effective, however, and the door will not open until the car has come to a stop, and the motorman has 'set' the treadle. That in alighting, should the foot or clothing be caught in the folding step, the interlock would still be held so that the car could not be moved until the

obstruction had been pulled out. That the doors are balanced, namely, the air pressure is removed so that if the motorman should drop dead or fall in a faint while the doors were shut, any passenger could push the door open. That the reversing mechanism is so nicely adjusted that on merely touching the obstruction the door will reverse. That treadle doors are now in such general use that recently in one year one man operated cars so equipped carried over 600,000,000 passengers. (Paul, Plff's No. 718, p. 28.) That if a passenger steps on the plate while the car is in motion, the treadle door will not open (Buffe, Plff's No. 8, p. 24); and that the car will not start unless the doors are closed. (Beck, Ev. 282).

"The Master finds, however, that placing two men on a modern automatic safety car would result in some additional convenience to the public (Holtzclaw, Ev. 155); that such a man could make change, issue transfers, answer questions, help the school children on and off the cars, and assist in keeping the races separate. (Thomas, Mayor of Shreveport, 506; Holtzclaw, Ev. 155; Markham, Plff's No. 9, p. 36; Fennell, Plff's. No. 8, p. 85; Buffe, Plff's. No. 8, p. 30.) That Mr. Sutton, a former employee, of plaintiff company, operated a one man car in Shreveport and could not maintain the schedules required by the Company. That Mr. Harper had had the same experience. (Ev. 479.) That Mr. Bushart, who had also operated one man cars for plaintiff company, did not have this difficulty (Ev. 471); that children would 'meddle' with the mechanism of the cars when operated by one man, ring the gong, blow the whistle, climb on the back of the car and sometimes climb through the windows. (Sutton, 410; Harper, 482.) That on one occasion, while being operated by one man, a car belonging to plaintiff company backed down a hill during a storm after striking a Ford automobile, because the brake was full of dirt, and would not work. (Sutton, 421–422.) Mr. Sutton, however, admitted that he did not know anything about mechanics and Mr. Shuetter (Plff's. No. 7, (2) p. 5) testified that it was a physical impossibility for a car to so back down a hill with the modern appliances properly operated; that the treadle doors on the one man cars purchased in New Orleans, but never placed in commercial operation, sometimes fail to work because of dirt getting into the mechanism. (Boudreaux, Ev. 429.) That there have been some accidents from doors closing on passengers. (Butler, Plff's. No. 20, p. 17.) Commis-

sioner Dawkins of the City of Shreveport, testified that in his opinion one man in making change while the car was in motion would be more liable to collisions. (Ev. 445.) Mr. Bushart had had an accident while operating a one man car, but admitted that the accident would have happened likewise if the car had been operated by two men.

"That in some instances one man cars cannot get away as quickly as two man cars, because the motorman is compelled to collect the fares and make change (Smith, 473–5); and that sometimes the motorman collects fares while the car is in motion, this being contrary to the usual rules of the Company. (Smith, 474.) That in cases of great emergency, a conductor could be of some advantage (W. L. Smith, Plff's. No. 12, p. 12); that while two men on the car would be safer, one man is safe, (W. L. Smith, Plff's. No. 12, p. 14); and it was shown that in Atlanta, where the cars are operated by one man, conversations between him and the passengers have been increased,—apparently over the conversations between motorman and conductor under the old system. (Butler, Plff's. No. 20, p. 9.)

"That in Dallas, hijacking and robbing the cash boxes on the cars had increased under one man operation. (Pack, Ev. 400.)

"The Master finds that in 1927 plaintiff company issued what is known as its 'Official Rule Book.' That in said book, which was issued for the purpose of guiding and instructing its employees in the proper discharge of their duties, many of the rules referred to the duties of conductors, and distinguished between the duties of such employees and the duties of the motorman; that among the duties of conductors was that of looking after aged or infirm persons, or women with children in their arms, and seeing that such persons were seated, if possible, before giving the signal to start; that in the event the motorman or conductor should become disabled while on duty, the central office should be notified of such fact by the one not disabled, and reasonable effort be made to avoid delay in the service; that when a car is detained for any cause, on or near a curve, or in a fog where it is liable to be struck by a following car, the conductor must go back and warn the operator of such car; that all rules applying to conductors and motormen apply to operators of one man cars.

"From the evidentiary facts, the Master finds that the type of car ordinarily called the 'one man car,' or more accurately speak-

ing, the modern safety car equipped with all of the automatic safety devices and operated by one man, has been shown by a clear preponderance of the testimony to be safer than its predecessor, the two man car."

As to the economy and efficiency of one man cars, the Master finds:

"The Master finds that the speed and schedules of street car systems have been increased under one man operation (Holtzclaw, Ev. 184), and that this is partly due to the fact that under such operation the companies are able to operate more cars. (Ev. 163.) That practically all the witnesses who testified on the point stated that better schedules were maintained, and a better average speed made possible by the one man system. (Koonce, Ev. 221; Hartford, Plff's. No. 15, p. 5; Harvey Plff's. No. 15, p. 29; West, Plff's. No. 7, (7), p. 28; Morgan, Plff's. No. 17, (1), p. 18; Hogan, Plff's. No. 7, (3), p. 5; Manning, Plff's. No. 7, (1), p. 7; Butler, Plff's. No. 20, pp. 21–22.) That in Galveston, after changing to the one man system, speed was increased 16%. (Carroll, Ev. 184.) Mr. Manning (Plff's. No. 7, (1), p. 8) testified that the increase was not due to any increase in the 'free running speed,' but because of 'snappier' operation of the one man cars. Mr. Fennell (Plff's. No. 8, p. 70) testified that his company was making the same speed with the new system. Mr. Ackerman (Plff's. No. 13, p. 16) gave as one reason for the increased speed that the motorman is not required to wait on signals from the conductor, and, therefore, accelerates stopping and starting.

"The Master further finds, with regard to schedules and speed, that in the congested areas of large cities, like Brooklyn, Atlanta, Knoxville, Kansas City, etc., 'loaders' or outside men are employed to collect fares, make change and assist patrons on the cars, (Buffe, Plff's. No. 8, pp. 40–48; Fennell, Plff's. No. 8, p. 74; Butler, Plff's. No. 20, p. 22; Kelly, Plff's. 19, p. 5).

"That on account of the economic side of the case, the evidence shows that in the operation of one man cars in practically all of the cities where operated, the wages paid the operators have been increased over those paid under two man control, and this increase has ranged from .03 to .08 per hour (Buffe, Plff's. No. 8, p. 20, etc.); that the increased wages results in more efficient operators (Holtzclaw, Ev. 136; Carroll, 181); that after the one man system has been thoroughly tested, the men are better satisfied and are inclined to remain longer with the company (McWhorter, Ev. 215); Delbert Smith, Plff's. No. 10, p. 8; Buffe, Plff's. No. 8, p. 20; Alexander, Ev. 247; Lindley, Plff's. No. 8, p. 93; Ackerman, Plff's. No. 13, p. 16; Kelly, Plff's. No. 19, p. 14), and that where the men were disposed to be dissatisfied at first, they were afterwards fully satisfied with the change (Koonce, Ev. 224; Butler, Plff's. No. 20, p. 23; Kelly, Plff's. No. 19, p. 14); and it is shown that the patrons generally are satisfied with the change to one man cars. (Carroll, Ev. 208; Hartford, Plff's. No. 15, p. 8)."

With respect to the necessity for discharging men he finds:

"That in making the change from two men to one man control, it is not necessary to discharge any of the men. (W. L. Smith, Plff's. No. 12, p. 6, and other witnesses.) This is because the change is made slowly and what is called the normal 'labor turnover' takes care of the change. That the percentage of men quitting the service sometimes runs as high as 25% per annum. This means that out of 150 men, thirty-seven would quit the service every year, and in making the change to the one man system, the places of the men so quitting are not filled. According to Mr. McWhorter's figures, the labor turnover in Memphis reaches as high as 34% per annum, but the Master has not accepted this ratio as being representative of all the cities. The evidence fairly shows, however, that the change can be effected without discharging any of the platform men, and without any material added expense on account of wages.

"The Master finds from the evidence, with regard to the segregation of the races in the South, that there has been less friction under one man control than under two man control. Holtzclaw, Ev. 142; Carroll, p. 190; Alexander, 250; Koonce, 305; Butler, Plff's. No. 20, p. 18.) Varying reasons were given for this,—Mr. Koonce (Ev. 305) stating that a negro is not as apt to start trouble on the front end of a car as in the back, and that there was less friction when both races entered at the front, the negroes going to the back and making exit there. Mr. Markham, (Plff's. No. 9, p. 27) stated that better segregation was effected by permitting whites to make exit at the front and negroes at the rear, and Mr. Kelly (Plff's. No. 19, p. 13) stated that there had been less friction on his system because the conductors formerly had been inclined to talk harshly and bullying to the negroes.

"As to the necessity for two men in the operation of street cars generally, since the inauguration of the modern improvements with which the same are now equipped, and as bearing on the questions previously considered, the Master finds that the evidence preponderates against any social, industrial or mechanical necessity for two men. In this connection, several witnesses testified that on a modern car equipped for operation by one man, there is nothing whatever for a second man to do (Markham, Plff's. No. 9, p. 24); Steele, Plff's. No. 7, (5), p. 6); and W. L. Smith (Plff's. No. 12, p. 7) testified that an additional man was useless, and Del A. Smith, (Plff's. No. 10, pp. 11–12) testified that such a man was mere excess baggage and likened him to an additional fireman on a locomotive equipped with an automatic stoker; and Steele, (Plff's. No. 7, (5), p. 6) stated that his company placed an additional man on such a car, and that 'he sat down and took life easy.'

"The Master finds from the evidence since 1917, the operation of one man cars has been approved by the Public Service Commissions of those states in the Union in which such cases have come before such Commissions having jurisdiction of the question presented, and where one man operation has been under attack; and since said year no Public Service Commission has refused to permit the operation of such cars, and since 1924, no Commission has limited the right to use one man cars subject to any particular conditions. (Ev. 382–399; Extracts from Public Utilities Reports which, under agreement of counsel, could be considered by the Master, and marked 'M-A.')

"As to the number of one man cars now operating in the United States, it is shown that out of an approximate total of 80,000 street cars now being operated, about 30,000 of these are of the one man type (Beck, 291); and that in cities having a population of more than 81,000, there are now some 16,027 one man cars in operation as against 87 in 1917. (Plff's. Ex. No. 17, Murphy, Ex. No. 2, attached.)"

A careful examination convinces me that the master's findings of fact are reasonably supported by the record. Under the circumstances, it would seem that the only choice lies between an increase in the net revenues of the plaintiff or its ultimate liquidation and the loss of street car service to the city of Shreveport. I have had occasion to participate in at least two cases brought against the Public Service Commission to obtain authority to increase fares, but, as pointed out above, no appreciable benefit was derived therefrom, and I do not believe that plaintiff can hope for any relief from its financial distress in that direction.

When confronted with this condition, I believe it is the duty of the court to carefully weigh the proof as to the necessity and reasonableness of a municipal regulation, for the purpose of determining whether it amounts to a fair attempt to insure safety to the public, or is arbitrary and influenced by other considerations. It is common knowledge that the automobile has seriously affected the earnings of street railroads all over the country, and, as stated by the master, no Public Service Commission in any state where the question comes under its jurisdiction now refuses to permit the use of one-man safety cars. Conditions are altogether different to what they were in 1917, when the question went from the courts of this state to the Supreme Court, in the Sullivan Case. Then the one-man car was in its experimental stage, but now the new type of safety car, with all modern devices, appears to be equally as safe as those operated with both a motorman and conductor. A municipality's right under its police power to interfere in matters of this kind exists only when necessary to the safety and convenience of the public. The philosophy of our institutions warrants reasonable regulations only, and there must be some real justification for the exercise of the power. We know that thousands of busses have taken the place of street cars, and are being operated over the most populous sections of cities with the use of only one man. This type of conveyance is not confined to a fixed track, and hence is more liable to collision with other motor vehicles and traffic upon the streets. All of the arguments advanced against the use of one-man street cars, as well as others, can be urged against the use of busses, but the constantly growing necessity for quick transportation and the convenience of the public has outweighed such contentions. Street cars, for the present at least, appear to be an essential means of transportation for a large portion of the population of cities, particularly among those not able to own automobiles and the working class, and the loss of such service without an equally cheap substitute would be a serious handicap to a growing city. As to any contention that men presently employed may lose their positions by the

change, it may be suggested that, in view of the present financial plight of the plain-tiff company, if some means to permit it to continue operation is not found, it may be forced out of business with the termination of all jobs, or the city be compelled to take over the plant, in which case the loss would simply be transferred from its stockholders to the shoulders of the taxpayer. In the latter event, it has been demonstrated that factors enter into the operation of such prop-erties which seriously affect efficiency and economy.

■ On the whole, I believe the refusal to al-low the use of one man cars of the latest type, with all modern appliances for safety, at least until they can be properly tested, in the light of the proven experience of oth-er cities, is arbitrary, and amounts to a tak-ing of plaintiff's property without due proc-ess of law, results in confiscation, and the en-forcement of the ordinances complained of will be enjoined. The decree in this case will be so framed as to insure the use of the type of car which will give the greatest safety and efficiency, with the right reserved to the defendants to apply for a modification thereof, should conditions warrant.