**WEINBERG et al. v. NORTHERN PAC. RY. CO.**

No. 12872.

Circuit Court of Appeals, Eighth Circuit.

July 19, 1945.

Albert R. Scanlon, of Los Angeles, Cal. (A. G. McKnight and Harry E. Weinberg, both of Duluth, Minn., on the brif), for appellants.

Donald D. Harries, of Duluth, Minn. (L. B. daPonte, M. L. Countryman, Jr., and F. J. Gehan, all of St. Paul, Minn., and Gillette, Nye, Harries & Montague, of Duluth, Minn., on the brief), for appellee.

Before GARDNER, JOHNSEN, and RIDDICK, Circuit Judges.

GARDNER, Circuit Judge.

This is an appeal from a decree which permanently enjoined appellants, defendants below, from enforcing a certain ordinance passed by the City of Duluth, insofar as such ordinance prohibits the use of a certain General Electric 44-ton Diesel electric engine in performing certain switching movements in the switching yards of appellee in the said city, unless the engine be manned with a crew of not less than one qualified engineer or operator and one qualified fireman or helper. Defendants, who are here appellants, are officers of the City of Duluth, Minnesota, while the plaintiff is a railway company organized under the laws of the State of Wisconsin, owning and operating a system of railroads extending from a point on Lake Superior, in Wisconsin, into and through the State of Minnesota, with lines from St. Paul, Minnesota, to Duluth, Minnesota, and through and into the State of North Dakota and other states, and is a common carrier by railroad of interstate and intrastate commerce. The parties will be referred to as they were designated in the lower court.

Ordinance No. 6617 of the City of Duluth, the enforcement of which was enjoined as to certain area, was passed January 25, 1943, after the plaintiff had purchased a 44-ton Diesel electric engine. The ordinance defines a locomotive as "any and all railway engines, however propelled, when in use in the switching or transferring of railway cars upon railroad tracks within the corporate limits of the City of Duluth." Section 2 of the ordinance reads as follows:

"That to promote and protect the safety and welfare of employes operating locomotives on railroad tracks within the corporate limits of the City of Duluth, and to protect and promote public safety within the corporate limits of the City of Duluth where railroad tracks cross streets or avenues at grade, it shall be unlawful for any person to operate any locomotive, or cause or permit the same to be operated, upon any railroad tracks within the corporate limits of the City of Duluth, unless each such locomotive shall be then manned with a crew of not less than one qualified engineer or operator and one qualified fireman or helper."

Section 3 provides punishment for violation by fine not exceeding One Hundred Dollars, or by imprisonment not exceeding eighty-five days. Section 4 provides that each day any locomotive is operated in violation of the provisions of the ordinance shall be deemed a separate offense.

The complaint alleges that the ordinance is arbitrary, unreasonable and void; that the 44-ton Diesel engine may be operated safely by one man in both yard and road service and over roads and streets; that the Diesel engine was purchased for use and would be used only within the terminal at Duluth; that five or six times daily it will cross Twenty-first Avenue West with several passenger cars for the purpose of turning the same on the wye; that said Twenty-first Avenue is but little used by the public.

Admitting diversity of citizenship and other jurisdictional allegations, defendants by their answer put in issue the material allegations of plaintiff's complaint.

The trial court, responding to the issues joined by the pleadings, made findings of

fact. Findings numbered VI to XIV, inclusive, read as follows:

"VI. The area within which the plaintiff seeks to restrain enforcement of the ordinance is limited to the Duluth Union Depot switch yards, extending from the Depot sheds west of Fifth Avenue West in the City of Duluth, westward to the turning wye situated south of the southerly or lakeward end of the traveled portion of Twentieth Avenue West therein, and such additional distance west of Twentieth Avenue West as may be necessary to take the rear ends of trains beyond the westerly leg of said wye in order to permit trains to take or clear the switch to the wye in executing the turning about of trains.

"Such area is confined to the private right-of-way and property of the plaintiff Company and its wholly owned subsidiary, Duluth Union Depot & Transfer Company, except where the movement of trains takes them across a public crossing in said City of Duluth designated as Twenty-first Avenue West, at a point thereon approximately fifty (50) feet from the terminus of said Avenue on certain private property.

"The general nature of the operations which the plaintiff seeks by this action to pursue free from the restraint of said ordinance consists of the transfer of passenger cars from the Duluth Union Depot to the turning wye described above, the turning of trains or cars upon said wye, the movement of passenger cars to the coach yards immediately west of the Duluth Union Depot tracks, the transfer of cars from said coach yard to the passenger depot tracks, the making up of passenger trains in said depot, including the switching of express freight cars to be handled in such passenger trains, the handling and transfer of such railway cars as are strictly for the purpose of providing supplies and materials for use at the Duluth Union Depot, and such movements of the 44-ton Diesel electric locomotive employed in such operations as may be incidental to the foregoing, including travelling to and from the Northern Pacific's Roundhouse and machine shops located west of Garfield Avenue and South of Michigan Street in said city.

"VII. The use of the small Diesel engine with one operator in switching operations in yards where train traffic is dense has been general for some years on a number of other railroads, and the safety of operation thereof as experienced by such other railroads is fully sustained by the evidence.

"VIII. The switching operations which are carried on by the Duluth Union Depot & Transfer Company are relatively simple and free from any extra-hazardous conditions, and the yards at the place where these switching operations and movement take place are wide and spacious. The terrain is flat and the width of the yard is substantially three hundred feet.

"IX. The usual speed of the switching engine of the Duluth Union Depot & Transfer Company as it moves in the switching operations hereinbefore described is from ten to twelve miles per hour and does not exceed fifteen miles per hour.

"X. The cab of the Diesel engine purchased by plaintiff for use in the Duluth Union Depot operation is centrally located midway between the front and rear of the body of the engine, and the operator has an unrestricted 360 degrees view. By standing up the operator can see practically everything. When persons cross the tracks used in said switching operations, they are in full, unobstructed view of the operator or a switchman at all times.

"XI. The engine used in said switching operation is at all times under the direction and control of a switch crew, consisting of a foreman and two switchmen, in addition to the operator of the engine, and the Court finds as a fact that the switching operations of the Duluth Union Depot & Transfer Company can be safely made with this crew without the presence of a qualified fireman or helper.

"XII. The evidence proves that the presence of trespassers and licensees crossing plaintiff's tracks from time to time, presents no safety problem which requires a second man at all times to assist in the operation of the Diesel engine in question.

"XIII. There is no suggestion in the evidence that requiring the switchman to be on, or to cross over to the operator's side of the Diesel engine to give signals in the switching operations in question, presents any safety problem.

"XIV. The evidence shows that under all circumstances and conditions which are ordinarily and usually present, a 44-ton Diesel electric locomotive with only the engineer and the switch crew in attendance can be operated day after day in the switching operations of the Duluth Union Depot & Transfer Company with reasonable safety to the trainmen and to the pub-

lic, and the employment of a fireman or helper thereon would be mere surplusage, and the contribution to the safety of operation by his addition would be negligible."

The decree did not enjoin the enforcement of the ordinance generally but enjoined its enforcement as to the switching movements herein described insofar as those movements were effected by the use of the 44-ton Diesel engine.

In seeking reversal defendants contend: (1) That the ordinance was passed in the exercise of the police power of the city, and hence was authorized, and that the question of the safety in operation was fairly debatable; (2) that certain evidence was improperly received.

In addition to the foregoing, there is presented the question as to whether under its Home Rule Charter, the City of Duluth had power to enact this ordinance. The trial court in its opinion, referring to this question, among other things, said:

"Whether the City can enact legislation under a general welfare clause controlling switching operations on a railroad's private property is at least a close question. The showing herein would not sustain a finding that the health, safety and well-being of the public at large would be affected or jeopardized in any way by the operation of a one-man locomotive on the private property of the plaintiff. Certainly, this is true as applied to the limited operations of a 44-ton Diesel."

The trial court, however, did not find it necessary to pass upon this question, and although the question is presented by the record we shall follow the trial court in assuming without deciding that the ordinance is not invalid on its face, but that its invalidity arises, if at all, under the special facts and circumstances shown to exist.

■ As already observed, the decree does not adjudge the ordinance invalid as a whole but in a limited field of operation. An ordinance even though not invalid in its entirety may, nevertheless, in operation be found, under existing facts, to be arbitrary and unreasonable, and to that extent may be declared to be inoperative. Nashville, C. & St. L. Ry. v. Walters, 294 U.S. 405, 55 S.Ct. 486, 79 L.Ed. 949; Women's Kansas City St. Andrews Society v. Kansas City, 8 Cir., 58 F.2d 593; Evison v. Chicago, St. P. M. & O. Ry.

Co., 45 Minn. 370, 48 N.W. 6, 11 L.R.A. 434; City of St. Paul v. St. Paul City Railway Co., 114 Minn. 250, 130 N.W. 1108, 36 L.R.A.,N.S., 235, Ann.Cas.1912B, 1136; State v. Sheppard, 64 Minn. 287, 67 N.W. 62, 36 L.R.A. 305.

■ It is generally held that if the action of a legislative body is within the scope of its power, questions as to the reasonableness, wisdom and propriety of its action, if fairly debatable, are not for the determination of courts, but for the legislative body. State v. Modern Box Makers, Inc., 217 Minn. 41, 13 N.W.2d 731; South Carolina State Highway Dept. v. Barnwell Bros., Inc., 303 U.S. 177, 625, 58 S.Ct. 510, 82 L.Ed. 734; Standard Oil Co. v. City of Marysville, 279 U.S. 582, 49 S.Ct. 430, 73 L.Ed. 856; City and County of San Francisco v. Market Street Ry. Co., 9 Cir., 98 F.2d 628. The trial court had this rule in mind when it made its findings in this case, for it is said in the opinion, after referring to the rule that if the reasonableness of the ordinance presents a fairly debatable question the courts can not interfere:

"But that a 44-ton Diesel, with only the engineer and the switch crew in attendance, can be operated day after day in weather conditions and circumstances which are not adverse, with reasonable safety to the trainmen and the public, seems free from doubt after a careful consideration of all the testimony and a practical and realistic view of the entire situation."

■ On review it is not sufficient to warrant us in sustaining the determination of the lower court that the findings are supported by substantial evidence, but as said by the Supreme Court in South Carolina State Highway Department v. Barnwell Bros., supra [303 U.S. 177, 58 S.Ct. 517]:

"* * * we examine the record, not to see whether the findings of the court below are supported by evidence, but to ascertain upon the whole record whether it is possible to say that the legislative choice is without rational basis."

It is with this rule in mind that we consider the record in this case.

The Diesel engine purchased by plaintiff is a comparatively small one especially designed and constructed for operation by a single person. It is equipped with what is called a 360 degree cupola on the top

of its central point. The operator, stationed in this cupola, has a full view around the compass. When sitting at his position on the right side of the cab, he can see the left rail up to about twenty-five feet of the front of the engine and can see an approaching pedestrian from the left until he is within an area of fourteen feet from the left rail and less than twenty-five feet ahead of the engine. If the operator stands he is able to see practically everything. An operating officer of another railroad testified that on all of the 44-ton Diesels of his railroad the operator stands up in moving over crossings. An exterior view of the structure is shown in the record by photograph introduced as plaintiffs' Exhibit 40. The visibility from the cab in which the engineer is located is shown by photograph marked plaintiffs' Exhibit 28, showing the position of the engineer in the right side of the cab when the engine is in forward move. Similarly, the visibility is shown by photograph, plaintiffs' Exhibit 27, showing the position of the engineer in the right side of the cab when the engine is in back-up move.

The photographic exhibits referred to are here set out as follows:

Plaintiff's Exhibit 40.

Plaintiff's Exhibit 28.

Photograph shows position of engineer in right side of cab when engine is in forward move.

Plaintiff's Exhibit 27.

Photograph shows position of engineer in right side of cab when engine is in back-up move.

It appears from the testimony that the Illinois Central has been operating one-man Diesel engines in its Chicago loop switching district since 1933; the Chicago and North Western operates a one-man Diesel engine in its Chicago passenger terminal; the Missouri Pacific has been operating three 44-ton, one-man operated Diesel engines in yard service at Sedalia, Missouri, since 1941; the St. Paul Union Depot Company has been operating a 44-ton Diesel engine manned by one man in switching at its St. Paul terminal since May, 1941; the Rock Island operates a one-man 44-ton Diesel engine at Albert Lea, Minnesota.

The movement of this Diesel engine, with a description of the yards where operated, is well summarized by the trial court in its .opinion as follows:

"The switch engine moves the empty passenger coaches some fifteen blocks

through the yards of the plaintiff company to the wye. In this movement the engine heads the train. After the train completes its movement through the wye, there is a backward movement of some blocks to the part of the yard known as the coach yard, where the coaches are cleaned and serviced. Usually an hour or so before train departure, the particular train is placed on one of the seven tracks of the depot, and when departure is made a regular road engine is used. In the movements referred to, the switch engine is at all times ahead of the train except in passing over one of the arms of the wye and in moving cars to and from the coach yard. However, at all times the movements of the engine in switching or backing are controlled by the switch crew. The track over which the movement takes place is free from curves except at the wye and except a slight curve in the train movement as it passes over the switches leading to the coach yard. The yards, however, at the place where the switching operations and movement take place are wide and spacious and free from obstruction except at Twenty-first Avenue West, where there is a building at the northeast corner of the street intersection with tracks. All of the operations are on the private right-of-way of the plaintiff company except where the movement crosses Twenty-first Avenue West, a public crossing at a point some fifty feet from its terminus on certain private property. While in the past the switching operations referred to at times crossed Fifth Avenue West, which is protected by a switchman, gates and warning bell, it is stipulated that the proposed switching operation which is sought to be free from the mandate of the ordinance in question shall not cross Fifth Avenue. The usual speed of the switching engine as it moves in these operations is from ten to twelve miles an hour and does not exceed fifteen miles per hour. Across these tracks are some four viaducts for foot passengers which are an average distance of some four blocks apart, but notwithstanding these means afforded for pedestrian traffic, there are numerous paths across the tracks which are used by licensees as well as trespassers. However, when persons cross the tracks on any of the paths that may be found there, such persons would be in full, unobstructed view at all times. The terrain is flat and the width of the yard is substantially three hundred feet."

The court's opinion by reference was made a part of its findings.

Engineers are instructed to stop before the crossing at Twenty-first Avenue. A member of the switch crew stations himself at the crossing and makes sure that no vehicles are approaching which might be struck. When the train is backed over Twenty-first Avenue West to go in on the west leg of the wye, a member of the crew is stationed on the rear of the train so that he can stop it with an emergency appliance of the air brake. Twenty-first Avenue West is a dead end street, ending on private property fifty feet south of the crossing. The crossing is protected by a stop sign signal installed by the Minnesota State Highway Department.

It is thus seen that the switching operation is a very limited one, the distance traveled being approximately one mile, and in the movement the engine with its cars crosses only one open public highway or crossing. While the engine is said to be manned by one person in the switching movements here considered, there will always be employed an engineer and a switch crew consisting of three switchmen. The foreman of the switch crew supervises and directs the switching movements and is responsible for the movements of the switch engine. He is required to see that the members of his crew are properly positioned and that they watch the cars that he is handling. Of the other two switchmen, referred to as helpers, one is known as the man following the engine, and the other is known as the field man. The man following the engine cuts it off and couples it on. The field man lines up switches and gives signals. The man following the engine relays signals to the engineer. The helpers can and do ride on the left side of the engine at the front where there is any considerable movement, and relay signals to the engineer. In case of emergency one of them could go into the engine. If the train is on a curve or any place where the engineer's view may be obstructed, the switchmen place themselves so that the signal may be seen by the engineer. No switching movement can be made without a signal, and signals are always given on the engineer's side. If the engineer can not get a signal he stops the engine.

It is therefore inaccurate to say that this Diesel engine is controlled or operated by one man. It is in fact operated by one

man in the cab, with a crew of three to assist him outside of the cab. The engine, unlike an automobile, is not to be guided as to its course but it passes upon a definitely fixed track. It may pass either forward or backward. It touches a public crossing at only one place. This is protected by the standard State-installed crossing equipment, and by the switchmen who flag the crossing. This equipment carries no passengers and the crew is not directly serving the travel:ng public, but moving company equipment in the company's private yards preparatory to serving the traveling public.

■■ If the ordinance can be justified, it must be on the theory that it is a reasonable exercise of the police power vested in the City. The City Council, however, may not under the guise of protecting the public interest, arbitrarily interfere with the operation of the common carrier or impose unreasonable restrictions upon its lawful calling. To justify the legislation it must appear that the interests of the public generally, as distinguished from those of a particular class, require such interference, and even when this condition may be said to exist, the means to accomplish the purpose must be reasonably necessary and not oppressive nor arbitrary. Lawton v. Steele, 152 U.S. 133, 14 S.Ct. 499, 38 L.Ed. 385; Shreveport Rys. Co. v. City of Shreveport, D.C.La., 37 F.2d 910, affirmed, 5 Cir., 38 F.2d 945, 69 A.L.R. 340; Seaboard Air Line R. Co. v. Blackwell, 244 U.S. 310, 37 S.Ct. 640, 61 L.Ed. 1160, L.R. A.1917F, 1184; Atchison, T. & S. F. Ry. Co. v. LaPrade, 3-Judge case, D.C., 2 F. Supp. 855.

In City of Shreveport v. Shreveport Ry. Co., supra, a street railway company brought suit to enjoin the enforcement of certain ordinances which forbade the use of one-man street cars. In the course of the opinion the court, among other things, said [37 F.2d 917]:

"A municipality's right under its police power to interfere in matters of this kind exists only when necessary to the safety and convenience of the public. The philosophy of our institutions warrants reasonable regulations only, and there must be some real justification for the exercise of the power. We know that thousands of busses have taken the place of street cars, and are being operated over the most populous sections of cities with the use of only one man. This type of conveyance is not confined to a fixed track, and hence is more liable to collision with other motor vehicles and traffic upon the streets. All of the arguments advanced against the use of one-man street cars, as well as others, can be urged against the use of busses, but the constantly growing necessity for quick transportation and the convenience of the public has outweighed such contentions."

In the instant case, unlike the Shreveport case, no passenger traffic is involved.

■ It is said there was some conflict in the evidence and hence the question presented to the trial court was a debatable one, and the court should have denied relief. Certain witnesses testified, giving their opinions as to the danger of operating the one-man Diesel without a second man at all times in the engine. But opinions not supported by facts, and which are contrary to the physical facts and do violence to scientific principle or reason, are robbed of all probative value. It may well be doubted whether this question was one subject to expert testimony. Spokane & I. E. R. Co. v. United States, 241 U. S. 344, 36 S.Ct. 668, 60 L.Ed. 1037; Missouri, K. & T. Ry. Co. v. Grimes, Tex.Civ. App., 196 S.W. 691; Cleveland, C., C. & St. L. Ry. Co. v. De Bolt, 10 Ind.App. 174, 37 N.E. 737.

In Spokane & I. E. R. Co. v. United States, supra, in referring to opinions of experts offered to show the protection afforded to employees by certain equipment, the Supreme Court, speaking through Chief Justice White, among other things, said [241 U.S. 344, 36 S.Ct. 671]:

"Without stopping to point out the inappositeness of the many authorities cited in support of the contention, we think the court was clearly right in holding that the question was not one for experts, and that the jury, after hearing the testimony and inspecting the openings, were competent to determine the issue, particularly in view of the full and clear instruction given on the subject, concerning which no complaint is made."

■ In this connection it is to be observed that the trial judge not only viewed the premises but witnessed the operation of this Diesel engine so as better to understand the testimony of the witnesses, including that which went to the proof of physical facts. Courts may properly

subject the opinions of experts to a discriminating review, and the trier of facts is not ordinarily bound to follow the opinions of experts. Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967; The Conqueror, 166 U.S. 110, 17 S.Ct. 510, 41 L.Ed. 937; Hawkinson v. Johnston, 8 Cir., 122 F.2d 724, 731, 137 A.L.R. 420. In the last cited case we said:

"The weight to be given purely opinion evidence is always a matter for the appraisal and judgment of the trial court or jury, in the light of all the circumstances of the particular situation."

■ It is not enough to sustain this ordinance that some witness may have given it as his opinion that it was unsafe to operate this engine without it being manned with two men in the cab. If that were sufficient, no question could be imagined that could not be made debatable. But the test is that it must be fairly debatable; in other words, it must be reasonably debatable or justly debatable. Certainly these opinions must bear the test as to whether facts in the record rationally sustain them, and we think the facts do not sustain them. Without this opinion evidence there is not a scintilla of evidence in the record to sustain the legislation. As said by the Supreme Court in Adams v. Tanner, 244 U. S. 590, 37 S.Ct. 662, 664, 61 L.Ed. 1336, L. R.A.1917F, 1163, Ann.Cas.1917D, 973,

"Certainly there is no profession, possibly no business, which does not offer peculiar opportunities for reprehensible practices; and as to every one of them, no doubt, some can be found quite ready earnestly to maintain that its suppression would be in the public interest. Skilfully directed agitation might also bring about apparent condemnation of any one of them by the public. Happily for all, the fundamental guaranties of the Constitution cannot be freely submerged if and whenever some ostensible justification is advanced and the police power invoked."

It is said that weather conditions furnish a basis for the ordinance regulation. The evidence indicates that in time of extremely bad weather all movements cease. Certainly, an extra man in the cab of the engine in time of fog or blizzard could do no more nor see no more than one man in the cab, as he would be affected by the same weather conditions. Such conditions as cold weather, snow or blizzard would re-quire greater caution and care on the part of the switch crew and the engineer. Indeed, such conditions would impose greater responsibilities on those engaged in all railroad operations. It would clearly be unreasonable and arbitrary to hold that this Diesel engine should carry one extra member of a crew at all times because of such possible emergencies which are shown to be infrequent, and to the exigencies of which neither management nor employees are shown to be lacking in the desire or ability to respond.

There are certain paths over the tracks used by licensees and trespassers. The paths that come down to the tracks stop there although pedestrians sometimes continue over them. The paths are comparatively short and the tracks are level. The yard is three hundred feet wide. The maximum speed of the engine is fifteen miles per hour. The movement is controlled by a switch crew of three members besides the engineer. The movements are simple and the crew is thoroughly familiar with the operations. In view of all these facts the question of any safety arising by the presence of an additional man in the engine is purely imaginary and speculative.

The trial judge, who, at the request of both parties, viewed the engine in operation, was in position to determine what, if any, probative value to attribute to the opinions of witnesses of either of the parties. He was in equally advantageous position to determine the physical facts in relation to the movements involved in the switching operations.

After a meticulous examination of the testimony, including the exhibits, we are of the opinion that the findings of the court are not only sustained by the evidence, but that on the whole record the restrictions of this ordinance as applied to the limited movement covered by the court's judgment are without rational basis.

It remains to consider the contention that the court erred in its rulings as to the admissibility of certain evidence. It is not contended that any evidence offered by defendants was rejected. In the cross-examination of a witness by defendant's counsel it was brought out that the Rock Island Railroad was one of the largest users of Diesel power; that all Diesel engines beyond 44-ton weight were manned by two men on the Rock Island; that on some of the Diesels so manned the cab was located

in front of the engine. On re-examination it was sought to show why two men were employed on Diesels over 44 tons. Exhibit 61 was identified as an agreement between the locomotive firemen and engineers and the carriers, entered into pursuant to the Railway Labor Act, Title 45 U.S.C.A. §§ 151–163. This agreement provided in effect that a fireman or helper should be employed on Diesel engines on streamline or main line through passenger trains and all others weighing more than 90,000 pounds. It was objected to as incompetent, irrelevant and immaterial. The court in receiving the exhibit said:

"Well, on the other hand, I take it from your interrogation of Mr. Christoffel that you are going to contend that if two men are necessary on Diesel above the 44-ton class, they are necessary on Diesels of the 44-ton class. The railroad company, I take it, takes the opposite view, or they take the position that one reason at least why they have two men on the Diesels above 44 tons is by reason of the agreement that they made with the Brotherhood. Therefore, to the extent that it may tend to throw light upon the argument that I assume you will urge, I think it is material."

It should first be noted in passing that the case was tried to the court and not a jury, and if inadmissible for any reason, the presumption would be that the court considered only competent evidence. Garden City Feeder Co. v. Commissioner, 8 Cir., 75 F.2d 804; Donnelly Garment Co. v. N. L. R. B., 8 Cir., 123 F.2d 215; Drexler v. Commercial Savings Bank, 8 Cir., 5 F.2d 13. Quite aside from this, it would seem clear that the exhibit was made admissible by the cross-examination by counsel for defendant, and we think it was properly admitted for its evidentiary value. It was evidence of a recognized practice in the operation of Diesel locomotives weighing 44 tons or less.

Finally, it is urged that the court erred in admitting evidence as to the practice of operating one-man Diesel engines by other railroads. The evidence did not necessarily fix a legal standard of what is safe. It was, however, proof of the method of operation of this type of equipment by other railroads, and reflected the experience of other railroads in the operation of such equipment under comparable circumstances and conditions. This, we think,

was permissible. Cederberg v. Minneapolis, St. P. & S. S. M. Ry. Co., 101 Minn. 100, 111 N.W. 953; Kelly v. Southern Minnesota R. Co., 28 Minn. 98, 9 N.W. 588; Ross v. Duluth, M. & I. R. Ry. Co., 207 Minn. 157, 290 N.W. 566; Kolsti v. Minneapolis & St. L. R. Co., 32 Minn. 133, 19 N. W. 655; Texas & P. R. Co. v. Behymer, 189 U.S. 468, 23 S.Ct. 622, 47 L.Ed. 905.

The judgment appealed from is therefore affirmed.

JOHNSEN, Circuit Judge (dissenting).

As a legislative question, I think I would have voted against the enactment of this ordinance. As a judicial question, however, I do not feel able to say that the ordinance can make no contribution to the "safety and welfare of employees" and to "public safety" and so is invalid, or that its contribution to these purposes is so disproportionate to its burden that its application to appellee amounts to a deprivation of property without due process under the Fourteenth Amendment.

On the face of the ordinance and on the evidence in the record, I regard the situation as ruled by the full-crew decisions of the Supreme Court in Chicago, R. I. & Pac. R. Co. v. Arkansas, 219 U.S. 453, 31 S.Ct. 275, 55 L.Ed. 290; St. Louis, I. M. & S. R. Co. v. Arkansas, 240 U.S. 518, 36 S.Ct. 443, 60 L.Ed. 776; and Missouri Pacific R. Co. v. Norwood, 283 U.S. 249, 51 S. Ct. 458, 75 L.Ed. 1010. To illustrate, in the Chicago, R. I. & Pac. R. Co. case, an Arkansas statute prohibiting a railroad company from operating a freight train "with a crew consisting of less than an engineer, a fireman, a conductor, and three brakemen, regardless of any modern equipment of automatic couplers and air brakes," Acts Ark.1907, No. 116, was held not to be unconstitutional as against the railroad company's attack that "its said train was equipped with automatic couplers and air brakes, so that the cars thereof could be coupled and uncoupled without the necessity of brakemen going between the cars, and could be stopped by the application of the air brakes by the engineer of said train without the intervention or assistance of the conductor or brakeman * * *; that it had employed on said train a conductor and two brakemen, and that the employment of another brakeman on said train was unnecessary, because there were no duties connected with the running and op-

erating of said train to be performed by a third brakeman, and said act, in attempting to require [it] to employ three brakemen on said train, attempted to require [it] to expend a large amount of money for a useless and unnecessary purpose, and to deprive [it] of its property without due process of law." In the St. Louis, I. M. & S. R. Co. case, another Arkansas statute similarly was held constitutional which provided that "no railroad company or corporation owning or operating any yards or terminals in the cities within this State, where switching, pushing or transferring of cars are made across public crossings within the city limits of the cities, shall operate their switch crew or crews with less than one engineer, a fireman, a foreman and three helpers." Acts Ark.1913, Act 67.

The switching operations involved in the present case are those of the Duluth Union Depot & Transfer Company, a subsidiary corporation of appellee, but the record contains a stipulation that the matter shall be treated as though the Depot Co. had been made a formal party.

The record shows that the Depot Co. has for many years carried on its switching operations with a steam locomotive, containing an engineer and a fireman, so that the ordinance does not impose any new or greater financial burden on it than it has previously had. The engine, as a convenience in switching, has heretofore been operated across Fifth Avenue West, which lies just east of the depot, but to escape any question with respect to that thoroughfare the Depot Co. now proposes to tailor its operations and to run its engine only west of that Avenue. It is still necessary for it, however, to cross Twentieth Avenue West, another city street located in an industrial district, and in addition "there are numerous paths across the [seven] tracks which are used by licensees as well as trespassers," as the trial court stated in its memorandum opinion. These paths are scattered throughout the switching yards from the depot to Twentieth Avenue West, and they are used both by the employees of appellee and of other railroads for convenience in crossing and by persons going to and from various industries located south of the switching yards. There are curves in the tracks, around which the train must move as it is being switched, leading into the coach yard and also on the turning

wye. The average train pushed or pulled in the switching operations consists of seven to ten passenger coaches or Pullman cars, and the length of such a ten-car train is approximately 700 feet. Duluth, by reason of its geographical location, is subject to heavy rains, to fogs, to snowstorms from October to April, to strong winds and blizzards, and to temperature variations down to 30 degrees below zero.

The evidence further shows that part of the regular duties previously performed by a fireman on the switch engine has been to observe all fixed signals along the tracks, such as those on switches; to repeat them to the engineer, "whether the engineer can see the signals or not"; to keep watch especially of any and all conditions on the left side of the train and tracks; and to relay to the engineer any signals that may be given from the left side of the train. Besides the general traffic at Twentieth Avenue West, the pedestrians crossing the switching yards on the numerous paths, and the constant presence of the two switchmen around the train, it appears that there also are car repairers and car cleaners who have occasion at times to get on and off the cars and for whom a watch must accordingly be kept.

The trial court was of the opinion, as is the majority here, that all of these tasks of observation, cooperation and care on the part of a fireman could just as well be shifted onto the engineer and the switchmen in the Diesel-engine operation. The memorandum opinion of the trial court observes that "some testimony offered by the defendants would indicate that at times it would be inconvenient to give signals on the [right] hand side," and also that "it may well be that, under some circumstances and conditions, the evidence presents at least a debatable question as to the necessity of having a 44-ton Diesel manned by two men in order to insure safety to the public and the employees", but that the engineer could be required to stand up when it was advisable to enlarge his scope of vision, and the switchmen could be directed to cross over the track—necessarily under, over, through, behind or in front of the train—so as to enable them to give all signals on the right hand side, and "if there are any adverse weather conditions such as fog, rain, or snow, and the movements of the Diesel thereby become hazardous, one of the switchmen, in view of

.he very limited operations contemplated, could ride in the cab with the engineer."

But all of this seems to me only to demonstrate the existence of a legislative safety field and creates or countenances, I think, judicial or employer alternatives for legislative judgment and prescription. Where it is necessary in some railroad operation to take special steps to protect public and employee safety, the question of what should be done and how is in my opinion properly a matter for legislative choice,[1] subject only to the conditions (1) that the prescription or prohibition made will contribute to the safety-purpose intended or can at least debatably be said to do so, and (2) that its public contribution must not be so disproportionate to its private burden as to amount in practical application to a deprivation of property without due process.

I have heretofore said, and tried to demonstrate, that I do not see how legally it can be claimed that the ordinance involved is incapable of making any contribution to public and employee safety. I believe that the city council could legitimately conclude, therefore, whether its legislative judgment might be wise or unwise, that the presence of a fireman or helper in the engine cab could, under the conditions which I have set out from the record, contribute such observation, cooperation and care in switching operations as would be a sound factor in public and employee safety. This leaves then, as the only remaining question, whether the safety contribution that might be thus made is so disproportionate to the burden of the ordinance as to make it unconstitutional in its application to the operations of the Depot Co.

The Depot Co. has made no showing in the record that entitles or that enables that question to be given any deep consideration. The only evidence that it has introduced which in any way touches on the question is the testimony of one witness that compliance with the ordinance would involve a payment in firemen's salaries of $4,917.60 annually, and of another witness that the expense would run between $6,000 and $7,000 a year. The trial court found that obedience to the ordinance would cost the Depot Co. "at least five thousand dollars per year." But an expense of that amount in railroad operation, where public and employee safety is involved, can hardly soundly be said to be so disproportionate on its face, without further evidence, as to entitle it to be branded as an unconstitutional deprivation of property. One accident avoided could alone make it a wise expenditure. How great is the burden it imposes on the Depot Co. in relation to the possible revenue from its operations, the record does not attempt to disclose. The only other relevant fact that we know in the situation is that it is an expense which the Depot Co. has always heretofore had and paid. The language which the Supreme Court used in relation to the Arkansas full-crew statutes in Missouri Pacific R. Co. v. Norwood, 283 U.S. at page 255, 51 S.Ct. at page 461, 75 L.Ed. 1010, is equally applicable here: "While cost of complying with state laws enacted to promote safety is an element properly to be taken into account in determining whether such laws are arbitrary and repugnant to the due process clause of the Fourteenth Amendment, * * * there is nothing alleged in that respect which is sufficient to distinguish this case from those in which we have upheld the [full-crew] laws in question."

The majority opinion and the trial court have both assumed, without deciding, that it is within the power of the city commission of Duluth to enact such a safety ordinance, if it otherwise is valid, and so I shall not discuss that question. I am unable to agree, however, for the reasons which I have given, that we have any right to declare the ordinance unconstitutional, either from its face, or on the evidence in the record, or under the decisions of the Supreme Court, and I therefore respectfully feel compelled to dissent.

---

[1] We are not here concerned with any question of conflict between federal and state regulations.